[Cite as *In re K.M.*, 2015-Ohio-4682.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re K.M. et al., | : | |
| (M.K., | : | Nos. 15AP-64 (C.P.C. No. 11JU-5029) |
| Appellant). | : | (REGULAR CALENDAR) |
| In re A.R., | : | |
| (M.K., | : | and No. 15AP-66 (C.P.C. No. 11JU-5028) |
| Appellant). | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on November 12, 2015

*Nowicki & Vonderwell, LLC,* and *Marcy A. Vonderwell,* for appellant M.K.

*Robert J. McClaren,* for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

HORTON, J.

{¶ 1} Appellant, M.K. ("mother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which terminated her parental rights and granted appellee's, Franklin County Children Services ("FCCS" or "the agency"), motion for permanent custody of K.M., J.M., C.M., and A.R. (collectively "the children"). Because the trial court's judgment granting permanent custody of the children to FCCS is not against the manifest weight of the evidence, is supported by clear and convincing evidence, and is in the best interest of the children, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   FCCS filed a complaint on April 13, 2011, alleging that the children were neglected and dependent children. The complaint alleged that, on January 13, 2011, police officers responded to a call of a disturbance at mother's home. When the officers arrived, mother appeared intoxicated and was unable to communicate with the officers. There was no food in the home, the toilets were overflowing with feces and urine, and there was a broken window in the home. A registered sex offender was also residing in the home. The children had poor hygiene, and were later treated for lice. The children also had numerous unexcused absences from school and were not doing well academically. The children were removed from the home that evening. At the time the children were removed, A.R. was 9 years old, K.M. was 7 years old, J.M. was 6 years old, and C.M. was 5 years old.

{¶ 3}   The trial court granted FCCS temporary custody of the children, and a guardian ad litem ("GAL") was appointed. On June 6, 2011, the trial court found the children to be dependent, pursuant to R.C. 2151.04(C).

{¶ 4}   A case plan with the goal of reunification was established for mother and for K.E.M., the father of K.M., J.M., and C.M. The father of A.R. is P.R.; P.R. is currently incarcerated and has taken no action in this case. K.E.M.'s case plan obligated him to complete random drug screens, complete alcohol and drug assessments and any subsequent recommendations, to enroll in and complete domestic violence classes, and to complete parenting classes. Mother's case plan obligated her to complete random drug screens, complete alcohol and drug assessments and any subsequent recommendations, enroll in and complete domestic violence classes, to secure and maintain safe and stable housing, and to complete parenting classes.

{¶ 5}   Although K.E.M. completed parenting classes, he failed to complete any other aspect of his case plan. K.E.M. admitted "to having an opiate addiction," and informed the GAL that "he continues to use opiates and is not in any treatment program." (January 9, 2012 GAL report, 5.) K.E.M. ceased contact with the agency in January 2012.

{¶ 6}   On May 29, 2012, FCCS filed a motion for permanent custody of the children. However, at the July 9, 2012 hearing on the motion, FCCS asked the magistrate

to amend the motion to a request for an extension of temporary custody. The magistrate granted FCCS' request and extended temporary custody.

{¶ 7}   On November 2, 2012, FCCS filed a motion to terminate temporary custody. At that time, mother had made significant progress in her case plan objectives, she had numerous clean drug screens, had completed domestic violence classes, had maintained her housing and income, and had been visiting the children consistently. The magistrate granted FCCS' motion on January 9, 2013, terminated FCCS' temporary custody, and returned the children to mother under court ordered protective supervision. The magistrate also ordered that K.E.M. have no contact with the children outside of his supervised visits at FCCS.

{¶ 8}   On February 26, 2013, FCCS filed a motion for shelter care hearing and for temporary custody of the children. FCCS asserted in the motion that "[s]ince January 9, 2013, the service team ha[d] received reliable information that [K.E.M. was] having regular contact with the children outside of supervised visits at the agency." (Motion for Shelter Care, 1.) Mother also "had two positive tests for alcohol since the children returned home (January 19 and February 8, 2013)." (Motion for Shelter Care, 2.) The magistrate granted the motion on February 28, 2013, and returned the children to the temporary custody of FCCS.

{¶ 9}   A new case plan was filed on June 17, 2013 which, in addition to mother's previous case plan objectives, included a requirement that mother comply with the court order to keep K.E.M. away from the children.

{¶ 10} On October 30, 2013, FCCS filed another motion for permanent custody. Following evidentiary hearings on February 24 and March 5, 2014, the magistrate issued a decision granting FCCS' motion for permanent custody on April 22, 2014. The magistrate noted that while the mother was "clearly bonded" to the children, "she has never been willing and/or able to successfully complete drug and alcohol treatment, stay clean and keep the children away from" K.E.M. (Magistrate's Decision, 2.) The magistrate found clear and convincing evidence that granting FCCS permanent custody was in the children's best interests. Mother timely filed objections to the magistrate's decision. The trial court issued a decision and judgment entry on December 31, 2014, overruling

mother's objections, and approving and adopting the magistrate's decision granting FCCS' request for permanent custody of the children.

## II. ASSIGNMENTS OF ERROR

{¶ 11} Mother appeals, assigning the following errors for our review:

> [I.] THE TRIAL COURT'S GRANTING OF PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [II.] THE TRIAL COURT ERRED WHEN IT FOUND THAT THE AGENCY HAD MADE REASONABLE EFFORTS TO REUNIFY THE FAMILY.
>
> [III.] THE TRIAL COURT ERRED WHEN IT DETERMINED PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN.

{¶ 12} Because mother's first and third assignments of error relate to the court's analysis under R.C. 2151.414, we will address them jointly.

## III. STANDARD OF REVIEW

{¶ 13} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.,* 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.,* 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks,* 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati,* 38 Ohio St.3d 12, 19 (1988). A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones,* 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28.

{¶ 14} R.C. 2151.414 governs the procedure for granting permanent custody of a child to a public agency such as FCCS. "A decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.,* 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody if after a hearing it determines, by clear and convincing evidence, that (1) any of

the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child. Clear and convincing evidence means the measure of proof that produces " 'a firm belief or conviction as to the facts sought to be established.' " *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.* at ¶ 8.

{¶ 15} Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville,* 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. *In re Murray,* 52 Ohio St.3d 155, 157 (1990); *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham,* 59 Ohio St.2d 100, 106 (1979). Because the termination of parental rights has been described as " 'the family law equivalent of the death penalty in a criminal case,' " parents "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

## IV. FIRST AND THIRD ASSIGNMENTS OF ERROR - PERMANENT CUSTODY PROPERLY GRANTED

{¶ 16} Mother's first assignment of error asserts that the trial court's decision granting FCCS permanent custody of the children is against the manifest weight of the evidence. Mother's third assignment of error asserts that the trial court erred in determining that granting permanent custody to the agency was in the children's best interest.

{¶ 17} As noted above, the first step under the R.C. 2151.414 analysis requires the court to find that any one of the R.C. 2151.414(B)(1) factors have been satisfied by clear and convincing evidence. A trial court need only make one of the findings under R.C. 2151.414(B)(1). *In re R.L.*, 10th Dist. No. 07AP-36, 2007-Ohio-3553, ¶ 11; *In re Stafford*, 9th Dist. No. 2006 CA 00307, 2007-Ohio-928, ¶ 20. R.C. 2151.414(B)(1)(d) provides as follows:

> The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶ 18} The children were placed in FCCS' care on January 14, 2011. The children were adjudicated dependent on May 25, 2011, and FCCS was granted temporary custody at that time. Temporary custody was terminated on January 9, 2013 when the children were returned to mother's care. On February 28, 2013, the children were removed from mother's care and the agency received another temporary order of custody. FCCS was granted temporary custody of the children on June 7, 2013. Thus, when the agency filed the motion for permanent custody on October 30, 2013, the children had been in the custody of the agency for more than twelve months of a consecutive twenty-two month period. Mother does not dispute that the children have been in the custody of FCCS for the requisite R.C. 2151.414(B)(1)(d) time period.

{¶ 19} Because one of the factors in R.C. 2151.414(B)(1) applies to this case, we next turn to the best interests of the children. *In re K.L.* at ¶ 20. Notably, the focus of the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist.1994).

{¶ 20} In determining the child's best interest, the trial court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 21} The trial court thoroughly analyzed the R.C. 2151.414(D) factors, and found permanent custody to be in the children's best interests. Notably, R.C. 2151.414(D) does not give any one factor "greater relevance than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. Additionally, it has been held that " 'only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights.' " *In re N.Q.*, 2d Dist. No. 25428, 2013-Ohio-3176, ¶ 71, quoting *In re Z.T.*, 8th Dist. No. 88009, 2007-Ohio-827, ¶ 56.

{¶ 22} Under R.C. 2151.414(D)(1)(a), the court must consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and foster caregivers. Here, the record demonstrates that the children were bonded with their mother, and that mother was bonded with the children. Mother regularly visited the children, and interacted with the children appropriately at their visits. The caseworker observed that the children were also bonded with K.E.M.

{¶ 23} The children also have a positive relationship with their foster parents. The caseworker noted that the children "appear to love the foster parents," they hug "foster mom," and C.M. "seems particularly attached" to foster mom. (February 24, 2014 Tr., 109.) The two boys are "excited" to see foster dad when he comes home from work, and the foster parents "are also bonded with the children." (February 24, 2014 Tr., 109.)

{¶ 24} The children are also bonded with one another. Until August 2014, all four children resided in the same foster home together. A.R. was placed in a separate foster home in August 2014 after foster father found A.R. performing an inappropriate act on her younger sister, C.M.[1] A.R. told the GAL that she liked her new foster home, but does miss her siblings, and that she talks to "her siblings by phone." (Semi-annual review, 4.) The children now "see each other weekly" at their visits with mother. (February 24, 2014 Tr., 67.) The foster home of the three younger children is a prospective adoptive home, and the foster parents have expressed interest in adopting the children. A.R. is not in a prospective adoptive home. *See In re V.B.S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51 (noting that "the statutes governing permanent custody simply do not require an agency to prove that adoption is likely").

{¶ 25} Mother asserts in her brief that, because "A.R. is not welcome in the home of her siblings," it is "unlikely that the four children will be allowed to see one another again if permanent custody is granted." (Appellant's Brief, 8.) The caseworker, however, testified that the foster parents of K.M., J.M., and C.M., and A.R.'s current foster mother, "will get together and have the kids have like a little play date." (February 24, 2014 Tr., 67.) The GAL also noted that the foster parents of the three younger children have been "pretty flexible with allowing visitation and have gone out of their way to make [sure] that mom has been able to visit." (March 5, 2014 Tr., 7.) As such, the GAL was hopeful that the foster parents "would still make some sort of effort to keep that -- that relationship between those siblings intact the best they could." (March 5, 2014 Tr., 7-8.)

{¶ 26} Under R.C. 2151.414(D)(1)(b), the court must consider the wishes of the children. The GAL stated that the children had been clear "from the get-go that they want to go back with mom." (March 5, 2014 Tr., 9.) However, the children have also always maintained that they "like foster placement." (March 5, 2014 Tr., 9.) The children told the GAL "numerous times that they love the" foster parents, and want to stay with them if they can't go back with mother. (March 5, 2014 Tr., 14.) The GAL also stated that the kids would say things that, in his opinion, their mother "told [them] to tell me," and

---

[1] The trial court noted that A.R. was removed from the foster home after "foster father found [A.R.] licking toothpaste off of [C.M.'s] breasts." (Decision and Judgment Entry, 12.) The caseworker, Nicole Griesdorn, testified that foster father "witnessed [A.R.] licking toothpaste off [C.M's] arm," but C.M. later told foster father that A.R. also licked the toothpaste off her chest. (February 24, 2014 Tr., 98-99.) Foster parents asked that A.R. be removed from their home after this incident.

specifically noted his belief that the children's wish "to be reunited with mom was in part due to coaching." (March 5, 2014 Tr., 19-20.) The GAL also noted that, for the six weeks the children were returned to mother in 2013, there was "a lot of confusion," as the children believed that they would still be able to see their foster parents on the weekends. (March 5, 2014 Tr., 10.)

{¶ 27} Under R.C. 2151.414(D)(1)(c), the court must consider the custodial history of the child and determine whether the child has been in the temporary custody of a child-placing agency for twelve or more months in a consecutive twenty-two month period. As noted above, this factor is satisfied as the children had been in the temporary custody of FCCS for twenty out of the consecutive twenty-two month period preceding the October 30, 2013 motion for permanent custody.

{¶ 28} R.C. 2151.414(D)(1)(d) concerns the child's need for legally secure permanent placement. This factor "involves whether the child needs a legally secure permanent placement and whether this can be achieved without a grant of permanent custody to the agency." *In re D.P.* at ¶ 16. Mother has stable housing and stable income through her social security disability benefits. However, as the court noted, the persistent problem in this case has been "Mother's refusal to address her alcohol and substance abuse through in-patient treatment despite her extensive history of substance abuse, relapses, as well as direction from service providers, the lay guardian, and the Court." (Decision and Judgment Entry, 14.) The court concluded that, "[w]ithout prioritizing her responsibility to address her substance abuse, [mother] is not able to meet the basic needs of her children within a reasonable time." (Decision and Judgment Entry, 14.)

{¶ 29} Mother asserts that the children could have legally secure placement with her, as she substantially complied with her second case plan. Although mother did complete several aspects of her case plan, she has never successfully completed an alcohol and drug treatment program or maintained a sustained period of sobriety. *Compare In re Cunnigham*, 59 Ohio St.2d 100, 102 (1979) (noting that, when a child has been adjudicated dependent, there is no statutory requirement that the court make a separate finding of parental unfitness as a prerequisite to an award of permanent custody).

{¶ 30} Notably, mother's second case plan obligated her to "comply with all court orders including those regarding [K.E.M.'s] contact with the children," to "complete

random drug screens and they will be negative for all substances, including alcohol (missed screens will be considered positive)," and to complete an alcohol and drug assessment "and any subsequent recommendations that result." (June 17, 2013 Case Plan, 14.) Mother's conduct throughout the case demonstrates her refusal to seriously commit herself to achieving sobriety.

{¶ 31} In January 2012, the GAL noted that 76 drug screens had been offered to mother, and that mother had missed 45 of the screenings. As noted, the case plan informed mother that missed screens would count as positive screens. Of the drug screens mother completed, she was positive on four separate screens, twice for marijuana and twice for cocaine. The GAL estimated that, "since failing the earlier screenings, Mother has developed a pattern of only taking screenings when she knows she will be negative and not taking the screenings when she believes she will not pass." (January 9, 2012 GAL report, 3.) Mother was "thrown out of her first [treatment] program for failing to attend classes." (January 9, 2012 GAL report, 3.)

{¶ 32} Prior to the children being returned to her care, mother had completed 34 of the last 35 offered screens, with only one being positive for alcohol. However, after the children were removed from her care following her two positive screens for alcohol on January 19 and February 8, 2013, mother tested positive "for oxycodone on 3/26/13, 4/2/13, and 4/22/13 and positive for opiates/morphine on 4/16/13," and missed three other tests. (June 7, 2013 GAL report, 4.) In the GAL's January 3, 2014 report, the GAL observed that since the last court hearing on June 7, 2013, mother had completed 22 drug screens and missed 33. Of the 22 screens she completed, eight screens were positive for marijuana and/or alcohol and/or cocaine. In the GAL's February 21, 2014 report, the GAL noted that, "[w]hile Mother has made periodic efforts to address case plan issues, her effort[s] have fallen short in demonstrating her long-term sobriety and ability to care for the children." (February 21, 2014 GAL report, 3.)

{¶ 33} FCCS Caseworker, Nicole Griesdorn, noted that, over the course of this case, mother had entered "four different" alcohol and drug treatment "programs and ha[d] not been compliant with any of them." (February 24, 2014 Tr., 45.) Mother admitted that she had "issues" with every treatment program she had entered, and that she continued to use drugs and alcohol after leaving those programs. (February 24, 2014 Tr., 31.) Mother also

admitted that, while she believed she needed long term, inpatient treatment to address her addiction issues, she had told Caseworker Griesdorn that she "wasn't willing to do in-patient if that was the recommendation." (February 24, 2014 Tr., 32, 48.)

{¶ 34} Mother asserts that there is "no evidence that Mother's substance abuse is so severe that it makes the parent unable to provide an adequate permanent home for her children." (Appellant's Brief, 9-10.) We disagree. When officers initially removed the children from the home in January 2011, mother was so intoxicated she could not communicate with officers, the home was in deplorable conditions, and the children had poor hygiene. Mother admitted to a caseworker that "the children had been present for the party" that evening, and that the children had "witnessed the events of the party." (June 6, 2011 Case Plan, 3.)

{¶ 35} Mother was even unable to remain sober for the six weeks that the children were returned to her in 2013. The GAL noted that "[d]uring the short time that the children were returned to their mother there was a marked change in their attitude and behavior toward the GAL. The children who had been open, honest, and seemingly happy had become dishonest, evasive and unhappy." (June 7, 2013 GAL report, 5.) The GAL noted that the children's behavior and school grades improved once again after they were removed from mother's care and returned to foster care.

{¶ 36} Thus, as mother has never remedied her addiction and substance abuse issues which directly resulted in the initial removal of the children from the home, mother's substance abuse issues do prevent her from providing her children with a secure, permanent home. Additionally, mother has consistently refused to comply with the court's order to keep K.E.M. away from the children. She admitted that she allowed K.E.M. to have contact with the children when they were returned to her care.

{¶ 37} Furthermore, there was no other suitable relative that was either willing or able to assume custody of the children. As noted, P.R. was incarcerated and took no action in this case. FCCS explored other possible relative placements for the children, including the paternal grandparents, the maternal grandparents, two maternal aunts, and a non-relative. However, all of these individuals were either financially unable to care for the children, were not old enough to care for the children, had expressed no interest in taking

the children, or had a home study of their residence denied. (*See* Decision and Judgment Entry, 15-16.)

{¶ 38} Considering the ongoing nature of mother's addiction, and her refusal to achieve a sustained period of sobriety, the record readily demonstrates that the children would not have legally secure placement if they were returned to her care. As the magistrate noted, the "constant factor in this case is the parents' absolute unwillingness to even try to stop using drugs, knowing that FCCS had a motion pending that would permanently sever their parental rights." (Magistrate's Decision, 5.) The record thus demonstrates that, as mother continues to choose drugs and alcohol over her children, and as no suitable relative is either willing or able to assume custody of the children, legally secure placement of these children can only be achieved by granting permanent custody of the children to the agency.

{¶ 39} The factors set forth in R.C. 2151.414(E)(7) through (11) include: (1) whether the parent has been convicted of or pled guilty to various crimes; (2) whether the parent withheld medical treatment or food from the child; (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drugs; (4) whether the parent has abandoned the child; and (5) whether the parent has had parental rights terminated with respect to a sibling of the child. Specifically, R.C. 2151.414(E)(9) asks whether the parent has "placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan * * * requiring treatment of the parent was journalized."

{¶ 40} Here, mother's case plan obligated her to undergo substance abuse treatment. The caseworker testified that mother had not complied with any of the four treatment programs she had entered, and stated that mother refused to enter an inpatient treatment program even after her counselors recommended that she enter an inpatient program. Mother also refused to attend the Franklin County Drug Court program when the GAL offered to place her in that treatment program. The magistrate noted that, considering mother's refusal to complete an alcohol and drug treatment program, and considering the "conditions from which the children were removed initially; there is little doubt that the same or similar conditions would have existed had the children remained

with her in February, 2013, after [mother] again tested positive for alcohol two times." (Magistrate's Decision, 7.) We find that mother's conduct in this case satisfies R.C. 2151.414(E)(9).

{¶ 41} Lastly, mother notes that the "[a]gency's own caseworker testified that permanent custody was **not** in the best interest of the children." (Emphasis sic.) (Appellant's Brief, 11; February 24, 2014 Tr., 101.) Caseworker Griesdorn testified that "every kid should be able to see their mother," and stated that it was her "personal opinion" that mother "should be able to see her kids." (February 24, 2014 Tr., 83-84.) However, Caseworker Griesdorn also stated that she believes that children should be in the care of sober parents, and stated that it was her professional opinion that permanent custody was in the children's best interest, as mother had only managed to "maintain some sobriety" and had not been able to keep K.E.M away from the children. (February 24, 2014 Tr., 100, 102.) Caseworker Griesdorn's personal and professional opinions were properly placed before the magistrate and the trial court. The court was not obligated to elevate Caseworker Griesdorn's personal belief that mother should be able to see her children over Griesdorn's professional opinion, the recommendations of the GAL, or the remaining evidence in the record.

{¶ 42} Reviewing the record as a whole, we cannot say the trial court clearly lost its way, or that the evidence weighs heavily against the trial court's best interest finding. We find clear and convincing evidence supports the trial court's finding that it was in the children's best interest to grant FCCS permanent custody. The trial court's judgment awarding FCCS permanent custody is not against the manifest weight of the evidence.

{¶ 43} Mother's first and third assignments of error are overruled.

## V. SECOND ASSIGNMENT OF ERROR – REASONABLE EFFORTS TO REUNIFY

{¶ 44} Mother's second assignment of error asserts that the trial court erred in finding that the agency made reasonable efforts to reunify the family. The trial court found that FCCS had "made reasonable efforts to prevent or eliminate the need for removal of said children from the child's own home." (Decision and Judgment Entry, 19.)

{¶ 45} When the state intervenes to protect a child's health or safety, the state's efforts to resolve the threat to the child before removing the child, or to permit the child to

return home after the threat is removed, are called "reasonable efforts." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 24. Pursuant to R.C. 2151.419(A)(1), there are certain instances in child custody proceedings when FCCS is required to show that it made these reasonable efforts. *See In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914, ¶ 25; R.C. 2151.419(A)(1).

{¶ 46} However, the Supreme Court of Ohio has held the statute requiring reasonable efforts does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions under R.C. 2151.414. *In re R.G.,* citing *In re C.F.* at ¶ 41. "This does not mean that the agency is relieved of the duty to make reasonable efforts." *In re C.F.* at ¶ 42. In fact, "[a]t various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶ 47} Here, FCCS established that reasonable efforts were made prior to the hearing on the motion for permanent custody. The trial court adopted a decision of the magistrate on January 23, 2012, in which the magistrate found that "reasonable efforts have been made to prevent or eliminate the need for removal of said child from the child's own home." (January 23, 2012 Judgment Entry.) In a July 16, 2012 decision, the trial court adopted a magistrate's decision which found that "reasonable efforts have been made to prevent or eliminate the need for removal of said child from the child's own home," and that "placement and caseworker services were provided by the agency to the family of the child, but the removal of the child from home continues to be necessary." (July 16, 2012 Judgment Entry.) Again, on June 13, 2013, the trial court adopted a magistrate's decision which stated that "reasonable efforts have been made to prevent or eliminate the need for removal of said child from the child's own home," and that "[p]lacement and casework services were provided by the Agency to the family of the child," but that removal was still necessary. (June 13, 2013 Judgment Entry.) Accordingly, to the extent that a finding on reasonable efforts was required by R.C. 2151.419, the trial court previously made these findings, and mother failed to object to any of these reasonable efforts determinations.

{¶ 48} Moreover, the record demonstrates that FCCS did put forth reasonable efforts to reunify the family. Two case plans were approved and journalized during this case, and all parties signed the case plans and agreed to the terms. *See In re Evans*, 3d Dist. No. 1-01-75 (Oct. 30, 2001) (noting that case plans "are the tool that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated"). Mother successfully completed certain portions of her case plan, including completing parenting classes, domestic violence classes, and obtaining stable housing and income, but she failed to comply with the portions of her case plan which required her to complete random drug screens, to complete alcohol and drug treatment, and to keep K.E.M. away from the children. The agency assisted mother by giving her "different referrals for AOD assessment, for the ACS screens, for a CSW, which is a community service worker who also helped find community resources for [mother]." (February 24, 2014 Tr., 53.) The agency also "provided gas cards, cabs and bus passes" to mother throughout the entire life of the case. (February 24, 2014 Tr., 53.) The agency also paid mother's rent in January 2013 when the children were returned to her.

{¶ 49} Mother nevertheless asserts that the agency did not make reasonable efforts. Mother claims that the agency placed her in a "Catch 22," because her case plan obligated her to maintain stable housing, and to follow through with recommendations from her drug and alcohol treatment programs, which included attending inpatient treatment. (Appellant's Brief, 12.) Mother asserts that if she attended a long-term treatment program, she would lose her housing.

{¶ 50} One of mother's counselors, Gwen Whatley, explained that, after mother self-terminated from a 14-day outpatient treatment program, she recommended that mother consider attending the 6-month inpatient treatment program known as the Maryhaven women's program. Mother told Whatley "[f]rom day one * * * that she did not want long-term treatment." (March 5, 2014 Tr., 38.) Mother told Whatley that she "had a home and she did not want to lose her home and that she was working on getting her children back." (March 5, 2014 Tr., 38-39.) However, Whatley explained to mother that the women's program would provide housing for both mother and her children, and would assist mother in finding housing when she left the program. Whatley specifically noted that mother "would not have been homeless" as the program "help[s] women with

their housing." (March 5, 2014 Tr., 41-42.) Thus, mother was not placed in a "Catch 22" by her case plan. Mother simply did not want to complete a long-term inpatient drug and alcohol treatment program.

{¶ 51} Based on the foregoing, mother's second assignment of error is overruled.

## VI. DISPOSITION

{¶ 52} Having overruled mother's first, second, and third assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BROWN, P.J. and SADLER, J., concur.

————————————————