[Cite as *In re D.F.*, 2021-Ohio-446.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| D.F., III, A Minor, | : | No. 20AP-379 |
| | | (C.P.C. No. 17JU-7422) |
| (N.D., | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on February 18, 2021

**On brief***: William T. Cramer*, for appellant N.D.

**On brief:** *Emily L. McDonnell*, for appellee Franklin County Children Services.

**On brief:** *Michelle Mumaw*, for appellee CASA Franklin County, Guardian ad Litem

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant, N.D., appeals the June 4, 2020 decision and judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating the parental rights of appellant and granting permanent custody of D.F., III ("D.F.") to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I.  Facts and Procedural History

{¶ 2} D.F. was born on February 27, 2017.[1] Prior to D.F.'s birth, on or about May 9, 2014, D.D., a brother of D.F., was born to N.D. On June 10, 2014, the court removed D.D.

---

[1] The court observes that although many of the pleadings, briefs, and other filings in this case indicate D.F. was born on February 26, 2017, his birth certificate shows he was actually born the following day.

from parental care and placed him in the temporary custody of FCCS. D.D. is currently in the permanent custody of FCCS for the purpose of adoption.

{¶ 3} D.F. has been in the continuous custody of FCCS since March 17, 2017 when a temporary order of custody ("TOC") was obtained in Franklin C.P. No. 17JU-3172. D.F. was placed with his brother, D.D., in his current foster home. FCCS monitored N.D.'s visitation with D.F.

{¶ 4} Franklin C.P. No. 17JU-3172 was ultimately dismissed pursuant to the "90-day rule" and on June 2, 2017, FCCS refiled the complaint under Franklin C.P. No. 17JU-7422, alleging that D.F. was a dependent child pursuant to R.C. 2151.04(C). The complaint alleged that the whereabouts of both mother and father were unknown; that FCCS currently had temporary custody of D.D. pursuant to Franklin C.P. No. 17JU-5879 for which a direct permanent court commitment ("PCC") complaint was filed; that mother had failed to complete an additional psychological evaluation as ordered on May 3, 2017 and had been inconsistent in completing her random urine screens; and that father had a criminal history including menacing, unlawful restraint, and domestic violence. On June 5, 2017, a preliminary hearing was held at which the trial court granted a TOC of D.F. to FCCS in Franklin C.P. No. 17JU-7422. The court also ordered N.D. to complete a domestic violence ("DV") assessment, an alcohol and drug ("AOD") assessment, random drug screens, and a psychological evaluation, and further ordered all visitations of N.D. with D.F. to be supervised by FCCS.

{¶ 5} The instant matter was consolidated with the case for D.F.'s sibling, D.D., and on August 17, 22, and 29, 2017, the trial court heard testimony at the hearing wherein FCCS sought temporary court commitment of D.F. and permanent court commitment of D.D. Additionally, psychological reports prepared by Dr. Pawlarczyk were admitted into evidence, and the guardian ad litem ("GAL") submitted a written report.

{¶ 6} On September 6, 2017, the trial court issued its decision and judgment entry, wherein the court adopted the magistrate's decision adjudicating D.F. to be dependent and granting a temporary court commitment ("TCC") of D.F. to FCCS.[2] At the August 31, 2017

---

[2] The trial court also adjudicated D.F.'s sibling, D.D., to be dependent and granted a ("PCC") of D.D. to FCCS.

case plan hearing, the magistrate approved and adopted Case Plan No. 1.05, and on September 4, 2017, the trial court adopted the magistrate's approval of the case plan.

{¶ 7}   On October 7, 2017, N.D. filed an objection to the magistrate's decision which granted FCCS a TCC of D.F. On September 21, 2018 the trial court issued a decision and judgment entry overruling N.D.'s objection. On October 19, 2018, N.D. filed a notice of appeal of the trial court's September 21, 2018 decision and judgment entry overruling her objection.

{¶ 8}   Meanwhile, on February 9, 2018, FCCS filed its first motion for permanent custody of D.F. On December 10, 2018, FCCS filed its second motion for permanent custody of D.F. On March 22, 2019, E.J., D.F.'s maternal grandmother, filed motions to be added as a party and for custody.  Ultimately, the motions were dismissed for lack of service and failure to prosecute on October 24, 2019.  On September 13, 2019, this court issued its decision dismissing N.D.'s appeal for lack of jurisdiction.  *In re D.F., III,* 10th Dist. No. 18AP-811, 2019-Ohio-3710.

{¶ 9}   On March 10, 2020, the trial on FCCS's second motion for permanent custody proceeded.  As pertinent to this appeal, the following evidence was adduced at trial on the motion.

{¶ 10}  Appellant N.D. testified first as on cross-examination after being called by FCCS.  She testified that she had two children but neither child was living with her in her home.  N.D. stated that D.F. had not lived with her since March 2017, and D.F.'s older brother had been placed for adoption.  She testified that D.F. was removed and placed with FCCS due to the case plan pertaining to D.F.'s older brother that was in place at the time D.F. was born.  (Mar. 10, 2020 Tr. at 14-15, 23.)

{¶ 11}  N.D. testified that she was familiar with the case plan for D.F. and had discussed it with the caseworker.  She testified that her understanding of the case plan objectives was that she was supposed to complete "a domestic violence, parenting, drug and alcohol [screens]" and have stable housing, stable income, and complete drug screens.  (Tr. at 16-18.)

{¶ 12}  N.D. testified that she struggled with housing in March 2017.  (Tr. at 15.)  She stated that she was living with a family member when D.F. was born and when he was removed from her care in March 2017, and that she moved into her own place a month

later. (Tr. at 23-24.) She testified that she was evicted in April 2018 and then moved in with her aunt for six months. (Tr. at 26.) N.D. testified that her eviction was a result of not paying rent and a domestic dispute involving a shooting when D.F.'s father had tried to kill her in 2017. (Tr. at 79, 81.) N.D. testified that after she had lived with her aunt, she moved to an apartment that was not her own and stayed there for ten months before moving into a homeless shelter. Three months later, she moved to her current apartment on Refugee Road. N.D. testified that at the time of trial, the apartment was unlivable due to a burst water pipe and flooding, and that she was staying with a friend. (Tr. at 21, 26-28.)

{¶ 13} Regarding employment, N.D. testified that she was starting a new job at Urban Air two days after the trial, would earn $10 per hour, and planned to work fulltime from 4:00 p.m. "until close." (Tr. at 28, 66.) She testified that at the time D.F. was removed from her care she was employed at Buffalo Wild Wings, and that in April or May 2017 she began a new job where she remained for the majority of 2017. After that, she began a new job in August 2018 where she remained for approximately one year. N.D. testified that she then worked at another company from August 2019 to September 2019. N.D. testified that she worked at her most recent job from November 2019 through February 2020, when she was laid off. (Tr. at 28-33.)

{¶ 14} N.D. then testified that she had completed psychological evaluations in 2014, 2015, and 2018, all of which had been performed by Dr. Pawlarczyk. Dr. Pawlarczyk recommended counseling, which she began in March 2018. N.D. stated that she was still engaged in counseling at the time of trial. (Tr. at 34-40.)

{¶ 15} Next, N.D. testified that she began domestic violence programming, including counseling and classes in March 2018. (Tr. at 37, 42-43.) N.D. testified that from 2014 through 2017 she had been interacting with D.F.'s father, with whom domestic violence occurred. The last time she interacted with D.F.'s father was 2017. N.D. further testified that a physical altercation with a family member with whom she was living occurred in 2019, resulting in her moving to the homeless shelter. (Tr. at 44-47.)

{¶ 16} N.D. then testified that she completed alcohol and drug programming at the Columbus Health Department in December 2018. (Tr. at 49.) She admitted that she was signed up for urine screens and that she had missed "a lot" of them. (Tr. at 50.) N.D. denied using alcohol or marijuana after D.F. was removed from her care and testified that it

surprised her to know that five urine screens from 2019 were positive for alcohol. (Tr. at 50-51, 83-84.) N.D. testified that she currently did nothing to maintain her sobriety and that it was easy to do because drugs were never a problem for her. (Tr. at 84-85.)

{¶ 17} N.D. testified that she completed parenting classes at the Columbus Health Department in 2018. (Tr. at 50-51.) She testified that she visited D.F. weekly at FCCS offices, and only cancelled or missed visitation due to a lack of transportation. She further testified that bus passes were her transportation. (Tr. at 52-53.) N.D. stated that although she did not recall how many visits she had attended for several months, she admitted she did not visit D.F. from December 24, 2017 through January 28, 2018. She further acknowledged that there were substantial periods of time when she did not have transportation, and that she missed some visits due to illness as well. (Tr. at 54-64.)

{¶ 18} Following the testimony of N.D., FCCS called child welfare caseworker Jade Lichtenberg to testify. Ms. Lichtenberg testified she was assigned to N.D.'s case on November 2, 2018. (Tr. at 89.) The case was opened with D.F. because N.D. already had an ongoing case with another child [D.D.]. (Tr. at 90.)

{¶ 19} Ms. Lichtenberg testified that the June 5, 2017 TOC required that N.D. complete an AOD assessment; a domestic violence assessment; and random screens. She testified that N.D. completed the AOD assessment, but that of 311 scheduled screens, N.D. missed 283, tested negative on 21, and tested positive on 7. She further testified that N.D. completed a domestic violence assessment through Southeast, but she was not eligible for services there because she was a victim, not an aggressor. N.D. would have needed to complete services for being a victim of domestic violence with a different provider, and to Ms. Lichtenberg's knowledge N.D. had not done so. (Tr. at 93-95, 102.)

{¶ 20} Ms. Lichtenberg testified that the case plan also required that N.D. complete a mental health assessment and follow any recommendations. The case plan also required a psychological assessment. Ms. Lichtenberg testified that although N.D. completed the evaluations, she did not consider this objective complete because counseling started only after N.D.'s assessment on October 21, 2019 and N.D.'s participation in counseling had been inconsistent. N.D. did complete the parenting classes required as part of the case plan. (Tr. at 97-98, 101-102.)

{¶ 21} Ms. Lichtenberg testified that although the case plan activities did not require stable housing or income, both issues were included in the "concerns" section of the case plan. (Tr. at 143-144.) She stated that N.D.'s current housing was unstable. N.D. was living with a friend and had been staying at a shelter. Therefore, Ms. Lichtenberg testified this objective was incomplete. (Tr. at 104-105.)

{¶ 22} Next, Ms. Lichtenberg testified that the case plan included that N.D. achieve employment stability. N.D. did not consistently provide paystubs to show proof of her employment, nor was Ms. Lichtenberg aware of the new employment which N.D. had discussed during her earlier testimony. She testified that there seemed to be many periods of time during which N.D. was changing employers and went without pay. (Tr. at 105-106.)

{¶ 23} Regarding N.D.'s visits with D.F., Ms. Lichtenberg testified that the visits were inconsistent. More specifically, N.D. was offered 117 visits and attended 59. N.D. did not attend any visits between January 28, 2018 and May 6, 2018, a period of over 90 days. Ms. Lichtenberg provided N.D. with monthly bus passes to help her get to visitation, but clients are responsible for calling the caseworker at least three days in advance to obtain a bus pass. When N.D. requested a bus pass, there was always one provided. (Tr. at 106, 111-112, 118, 152, 174.)

{¶ 24} Ms. Lichtenberg testified that she visited D.F. in his foster home many times and was required to visit once a month. She testified that D.F. was comfortable and happy in the foster home and was very bonded with his foster parents, with whom he had lived his entire life. Additionally, D.F. was bonded with his brother, D.D., who lived in the same foster home, and he was bonded with the foster parents' biological children who lived in the home. Ms. Lichtenberg stated that the foster home was a prospective adoptive home for D.F. and the foster parents wished to adopt him. (Tr. at 123-126, 128.)

{¶ 25} Ms. Lichtenberg further testified that she investigated possible relative placements for D.F., but no alternative placement was found. She stated the alleged father never established paternity, never visited D.F., and never worked on any of the case concerns. (Tr. at 128-129.)

{¶ 26} Ms. Lichtenberg testified that she recommended that FCCS be granted "PCC" of D.F. She testified that her concerns regarding reunification with N.D. included instability of housing and employment, as well as N.D.'s inability to meet D.F.'s basic needs.

Ms. Lichtenberg also stated she believed it would be extremely traumatic for D.F. to be removed from his current foster family as he was very bonded with them and it was the only life he had ever known. (Tr. at 129-130.)

{¶ 27} Finally, Ms. Lichtenberg testified that she still had concerns regarding domestic violence, and that as recently as August 2019 N.D. had clearly been involved in an altercation as a victim. Additionally, Ms. Lichtenberg maintained concerns regarding alcohol and other drugs due to screens that were positive for alcohol after N.D. had completed her AOD assessment. (Tr. at 131-132.)

{¶ 28} Following the testimony of Ms. Lichtenberg, FCCS called S.T., the foster mother of D.F., who testified as follows. D.F. had been in her care since approximately March 17, 2017 and she is like his mom. She takes care of him, bathes him, feeds him, plays with him, teaches him and reads with him. D.F. hugs her, shows affection, and calls her "mommy." D.F. is in preschool, is involved with the family's church, and goes to a pediatrician. D.F. is like a son to her husband, and D.F. calls him "dad." (Tr. at 177-180.)

{¶ 29} S.T. further testified that D.F. and his biological brother who is also placed in the home are best friends, and that her three biological children have been in the home the entire three years with D.F. as well. She stated that she is applying to adopt D.F.'s biological brother and that if D.F. became available for adoption, she would be interested in applying to adopt him as well. (Tr. at 180-181.)

{¶ 30} S.T. also testified that before D.F. visits with N.D., "he's a pretty calm, fun, loving kid, likes to play, pretty low temper." (Tr. at 182.) But after visits, he does not sleep very well and would stay awake crying on nights after he visited with N.D. D.F. would also be more aggressive the next day. S.T. testified that this pattern had continued for the last year and a half or so. She stated she had never observed D.F. to cry at the end of his visits with N.D. or act as if he did not want to leave her. Additionally, S.T. testified that D.F. cried really hard when he was told they were going to see N.D. on the Sunday before trial, that he started hugging S.T. and shaking, and that he told her he was scared of N.D. (Tr. at 182-183, 185, 186-189.)

{¶ 31} After S.T.'s testimony concluded, FCCS called Mildred Brown, the ("GAL"), who provided the following testimony. Ms. Brown was appointed to D.F.'s case the day he was removed from N.D.'s care. Ms. Brown had visited D.F. monthly at his foster home for

three years. She had been involved with the family dating back to when D.F.'s older brother was in the temporary custody of FCCS. (Tr. at 189-191, 193-194.)

{¶ 32} Ms. Brown observed approximately 25 visits between N.D. and D.F. and she observed D.F.'s interactions with N.D. at the visits. She stated that she has seen D.F. talk to N.D. and interact and play with her but could never recall him hugging her. She also observed N.D. to sleep during two visits. Ms. Brown further testified that she has been in contact with D.F.'s teachers at his daycare, and they had reported outbursts by D.F. on Mondays, with the most recent one being on the previous Monday morning. (Tr. at 195-197, 200, 202.)

{¶ 33} Ms. Brown further testified that she has observed D.F.'s interactions with his foster family, that he is always on foster mother's lap, and that it is a loving, happy situation. She has observed D.F. with his biological sibling, also in the foster home, and they watch out for one another, play together, and are very close. In describing D.F.'s interactions with the foster parents' three biological children, Ms. Brown stated that you could not tell that they are not brothers and sisters and they definitely have a bond together. (Tr. at 227-228.)

{¶ 34} Finally, Ms. Brown testified that her recommendation was that FCCS receive permanent custody of D.F. She stated her recommendation was based on N.D.'s employment, lack of stable housing, and the number of visits that were missed or no-call, no-shows. She further testified that she had concerns regarding reunification related to domestic violence situations and D.F.'s food allergies. Specifically, she testified that foster mother had alerted N.D. to D.F.'s food allergy but N.D. gave D.F. food that triggered an allergic reaction, requiring D.F. to go to urgent care immediately after a visit. (Tr. at 204-206.) Upon inquiry by the court, Ms. Brown testified that she has asked D.F. about his wishes regarding where he wanted to live, that he has said "mommy" and pointed to his foster mother, and that this had occurred as recently as the month before trial. Ms. Brown also stated that she was not sure D.F. understands permanent custody and adoption. (Tr. at 233-234.)

{¶ 35} Following the trial, on June 4, 2020, the trial court issued a judgment entry sustaining FCCS' December 10, 2018 motion for permanent custody and divesting the parents of their parental rights. The trial court considered each of the factors in R.C.

2151.414(D) and determined there was clear and convincing evidence that it was in D.F.'s best interest to grant the motion for permanent custody.

{¶ 36}  This timely[3] appeal followed.

## II. Assignment of Error

{¶ 37}  N.D. assigns the following error for our review:

> The award of permanent custody is against the weight of the evidence.

## III.  Standard of Review

{¶ 38}  A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 14. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, an appellate court " 'will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).  Further, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *Id.*, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## IV.  Discussion

{¶ 39}  In N.D.'s sole assignment of error, she asserts the trial court's decision to grant permanent custody of D.F. to FCCS was against the manifest weight of the evidence. This assignment of error lacks merit.

---

[3]  N.D.'s appeal was filed outside the requisite 30 time period as set forth in App.R.4.  Nevertheless, the appeal was timely pursuant to the Supreme Court of Ohio's tolling order issued due to COVID-19.  *See* 03/27/2020 Administrative Actions, 2020-Ohio-1166.

{¶ 40} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio likewise has recognized the essential and basic right of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, and *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 41} R.C. 2151.413 permissively allows a public agency to file a motion requesting permanent custody of a child under certain circumstances. When the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, though, the agency *must* file for permanent custody. R.C. 2151.413(D)(1).

{¶ 42} R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines "by clear and convincing evidence, that '(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child.' " *In re E.B.* at ¶ 22, quoting *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14. Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply." *Id.* Second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.* Clear and convincing evidence means evidence that creates a firm belief or conviction as to the facts sought to be established. *In re E.B.* at ¶ 22, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42; *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *K.L.* at ¶ 14.

{¶ 43} Relevant to this appeal, R.C. 2151.414(B)(1) provides the following circumstances under which FCCS can move for permanent custody:

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.[4]

{¶ 44} In this case, it is undisputed that D.F. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established by clear and convincing evidence.

{¶ 45} Next, in determining the best interest of a child, R.C. 2151.414(D)(1)(a) through (e) sets forth the relevant factors that the court must consider in determining what is in the best interests of the child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater relevance than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

---

[4] The trial court also found that the factors set forth in R.C. 2151.414(B)(1)(a) (D.F. could not be placed with his parents within a reasonable time) and R.C. 2151.414(B)(1)(b) (D.F. had been abandoned by both parents) were applicable in this case. N.D. concedes that the first part of the permanent custody analysis is met under R.C. 2151.414(B)(1)(d) and only disputes the other two findings in the context of the best interest analysis.

{¶ 46} In this case, the evidence at trial overwhelmingly supported the trial court's conclusion that granting permanent custody to FCCS was in D.F.'s best interest. Under R.C. 2151.414(D)(1)(a), the trial court was required to consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Here, the trial court found that D.F. has lived all but 18 days of his life in the same foster home as his brother, D.D., and that D.F. is very bonded with D.D., his foster parents, and his foster siblings. The trial court further found that the foster parents are seeking to adopt D.D. and intend to seek to adopt D.F. as well if the pending motion for permanent custody is granted, and they all interact as a normal, comfortable, happy family. Finally, the trial court acknowledged that testimony of the GAL that removing D.F. from the only home he has ever known would be very traumatic for him.

{¶ 47} In contrast, the trial court found that N.D. had inconsistent parenting time and had missed visitation with D.F. for a period of 90 days. The trial court found that the GAL does not recall D.F. ever hugging N.D. or running to greet her at visitations. The trial court further found that D.F. tended to have outbursts at preschool on the Mondays after visitation that did not occur on other days of the week. Furthermore, the trial court found that on at least one occasion during a visitation, D.F. clung to foster mother, and prior to the latest visitation on the Sunday before trial, the GAL had to help calm D.F. down before his visitation with N.D. The evidence in the form of the testimony from the caseworker, the GAL and foster mother readily supported all of these findings and supported a conclusion that D.F.'s relationships with his foster family and his biological sibling, D.D., are much stronger than his relationship with N.D. Therefore, the "interaction and relationship" factor weighed in favor of awarding permanent custody to FCCS.

{¶ 48} R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, expressed either directly by the child or through the child's guardian ad litem. In this case, as noted previously, and as the trial court found, the GAL did not believe D.F. was old enough to understand permanency, but the GAL recommends the motion for permanent custody be granted. The court further noted it could infer D.F.'s wishes by his behavior before, during, and after visitations with N.D. as contrasted with his behavior with his foster

family. Thus, this factor weighs in favor of the trial court granting permanent custody to FCCS.

{¶ 49} R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the child. In this case, it is undisputed, and the trial court found that D.F. was three years old at the time of trial and had spent all but 18 days of his life in the home of his foster parents. Likewise, it is undisputed, and the trial court further determined that D.F. had been in the custody of FCCS for more than 12 months in a consecutive 22-month period. The foregoing findings are supported by the evidence and this factor weighs in favor of awarding permanent custody to FCCS.

{¶ 50} R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure permanent placement and required the court to consider whether this could be achieved without a grant of permanent custody to FCCS. Here, the trial court found that D.F. had been in the temporary custody of FCCS for almost his entire life and needed security and permanency. The trial court further found that as of the day of trial, N.D. had no home for D.F. if he were to return to her custody, despite having three years in which to secure stable housing. The trial court also found that N.D. had made an inadvertent yet dangerous mistake in giving D.F. a food containing milk while knowing that he had a food allergy to milk and milk products, resulting in a visit to an urgent care clinic. The foregoing findings are all supported by evidence in the record. Therefore, evidence in the record supported the trial court's conclusions that N.D. was unable to meet the basic needs of D.F., that D.F. needs a legally secure permanent placement as required by statute, and such a placement cannot be achieved without a grant of permanent custody to FCCS.

{¶ 51} Lastly, under R.C. 2151.414(D)(1)(e), the trial court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11). The trial court found that two factors were applicable: (E)(10), because N.D. (and alleged father) had abandoned D.F. by missing visitation for a period of 90 days; and (E)(11), because the parental rights of N.D. (and alleged father) were terminated with respect to D.D., the biological sibling of D.F. The trial court further found that N.D. had failed to provide clear and convincing evidence proving that, notwithstanding the termination as to D.D., she could legally secure permanent placement and adequate care for the health, welfare, and safety of D.F. The evidence in the record fully supports these findings.

{¶ 52} In sum, the record demonstrates that the trial court properly reviewed and weighed the evidence pertaining to all factors relevant to determining whether granting permanent custody to FCCS was in D.F.'s best interest. Upon our review of all of the evidence presented at trial in this case, we determine that there is competent and credible evidence to support the trial court's conclusion that a permanent commitment is in D.F.'s best interest and in accordance with the law. The trial court's decision is not against the manifest weight of evidence.

{¶ 53} Accordingly, we overrule the assignment of error presented by appellant N.D. and we affirm the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody of D.F. to FCCS.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.