[Cite as *In re J.S.*, 2021-Ohio-714.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of: J.S., a minor, :

(J.R., :

        Appellant). :

:

:

No. 20AP-68
(C.P.C No. 17JU-01-248)

(ACCELERATED CALENDAR)

D E C I S I O N

Rendered on March 11, 2021

**On brief:** *Yeura Venters*, Public Defender, and *Ian J. Jones*, for appellant J.R.

**On brief:** *Robert McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

BEATTY BLUNT, J.

{¶ 1} Mother, ("J.R."), appeals the January 2, 2020 order of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of J.R.'s 11-year-old son J.S. to appellee Franklin County Children Services ("FCCS"). (Jgmt. Entry at 14.) J.R. argues that the trial court's judgment terminating her parental rights and finding that permanent custody to FCCS was in J.S.'s best interest and is not supported by clear and convincing evidence and is against the manifest weight of the evidence. We overrule J.R.'s assignments of error and affirm the judgment of the trial court.

No. 20AP-68

{¶ 2} J.S. was born to mother J.R. and father J.S. on November 2, 2010. J.S. and his younger sister K.R. were taken into emergency care on January 6, 2017. The case was opened in December 2016; at that time J.R. and her children lacked stable housing, and the three of them (along with mother's then-boyfriend) were apparently living in a tent. J.R. then left the children with their maternal great-grandmother for one night, but afterward the great-grandmother refused to return the children to J.R. and instead called FCCS. The children were taken into emergency care, and neglect and dependency complaints were filed as to both. K.R. was subsequently adjudicated dependent and was placed in the custody of her paternal grandparents.

{¶ 3} J.S. was adjudicated neglected without objection on March 21, 2017. The neglect complaint alleged:

> The mother and father are not married. The whereabouts of the mother, [J.R.], are known at the time of filing. The whereabouts of the father, [J.S.], are not known at the time of filing. On or about January 4, 2017, Franklin County Children Services (FCCS) received a report indicating [J.S.] and his sibling [K.R.] had been staying with the maternal grandmother and a cousin since Christmas 2016. It was reported that [mother] wanted the children back and planned on sleeping in a tent with [J.S.] and [K.R.]. It was reported that there may be drug abuse by [mother] because she has been observed with slurred speech. Concerns were also expressed about domestic violence by the maternal grandmother and her boyfriend in front of [J.S.]. It was reported that [mother] has a history of homelessness and living in a tent * * *. It was also determined that [J.S.] has not been enrolled in school. [J.S.] and [K.R.] were placed in foster care.

(Compl. at 1.)

Temporary custody of J.S. was awarded to FCCS and a case plan was adopted on March 21, 2017, and he has remained in FCCS custody since that time. A first extension of temporary custody was granted on January 5, 2018; an amended case plan was adopted on January 12,

No. 20AP-68

2018; and a second extension of temporary custody was granted, and a second amended case plan was adopted on July 2, 2018.

{¶ 4} On November 12, 2018, FCCS filed a motion for permanent custody. The motion alleged that J.R. had failed to consistently engage and complete case plan objectives, had failed to address substance abuse and mental health concerns, failed to use medical, psychiatric, and psychological services, and failed to maintain consistent contact with J.S. for a period of 90 days. It was uncontested that at the time the motion was filed, J.S. had been in the custody of FCCS for more than 12 of the preceding 22 months.

{¶ 5} The case did not proceed to trial until over one year later, on December 6, 2019. By that time, J.S. had been in the temporary custody of FCCS for over 34 months. However, J.S. had several different placements during that period—he was in foster homes from January 2017 through August 2017; he was placed in a St. Vincent's local residential facility from August 2017 through November 2018; from November 2018 through November 2019 J.S was placed at the Northcutt residential facility in Dayton; and from November 2019 through December 2019 (the date of trial), he was placed in another foster home.

{¶ 6} At trial, evidence was adduced from J.R., the FCCS caseworker, and the guardian ad litem. J.S.'s father did not appear at trial and had had no contact with his attorney (who had filed a motion to withdraw based on lack of communication despite efforts), and according to the caseworker the father consistently maintained that he did not want to be involved with J.S. or to seek reunification.

{¶ 7} J.R. testified that she has had five children, one of whom is deceased and none of whom she has custody of. At the time of the hearing, she was not aware where J.S had been placed, and stated that the reason she and the children were living in the tent was

that "I chose a guy over my kids 'cause (sic) I was young." (Dec. 6, 2019 Tr. at 34.) She admitted that her participation in counseling and her use of prescribed medication has been inconsistent due financial, scheduling, and transportation problems, and that she had just restarted her medications the day prior to the hearing after a break. She testified that she had been attacked with a knife on two different occasions by a prior boyfriend, that she had broken off her relationship with that man and immediately started a new relationship approximately 4 to 5 months earlier, that this was the third relationship she had been in since J.S. was removed from her care, and that she had lived with all three and at different points during that time. Finally, she admitted that she has not been involved in J.S.'s treatment despite an invitation from the caseworker, that she does not have any knowledge of J.S.'s treatment appointments or remember the medications J.S. is on, that the frequency of her visits with J.S. has been varied and inconsistent, that at the time of the hearing she had not visited with him for over a month, and that she "didn't even make it up there for his birthday." *Id.* at 77.

{¶ 8} The trial court made detailed factual and legal findings regarding the case. *See generally* Decision and Judgment Entry. It observed that at the time they were living in the tent, there was an incident where J.S. drank vodka out of a two-liter bottle. The court also noted that when he was placed in FCCS custody, J.S. tested positive for tetrahydrocannabinol (THC). The court found that J.S. has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Adjustment Disorder, Oppositional Disorder, and Post-Traumatic Stress Disorder (PTSD). J.S. has serious behavioral issues and sees two different counselors a total of four times each week. He is prescribed five different medications. The court observed that based on her trial testimony, J.R. has not participated

No. 20AP-68

in J.S.'s counseling, is unable to remember J.S.'s medications, and she does not know how many therapists and doctor appointments J.S. has.

{¶ 9} As to the case plan for reunification, the trial evidence demonstrated that there were four main conditions. J.R. was required to: (1) have monthly visits with the caseworker; (2) complete random drug screens if illicit use was suspected; (3) find and maintain income and safe housing for herself and J.S.; and (4) complete mental health counseling and follow through with any recommendations. *Id.* at 9. The trial court had significant concerns about J.R.'s compliance with the third and fourth conditions.

{¶ 10} As to the third condition, although J.R. had been working at Wal-Mart steadily for the six months leading up to trial, her employment prior to that was scattershot, as was her housing. After the commencement of the case, J.R. moved in with her sister, and then moved to Chillicothe to live with her ex-boyfriend's sister. In June 2019, J.R. moved back to Columbus to an apartment with another boyfriend, who left her as the sole name on the lease when they broke up. At the time of trial, she lived in that same apartment with a different boyfriend, who was assisting with the rent. The court was "concerned that Mother's housing is substantially linked to the assistance of her current of several live-in boyfriends." *Id.*

{¶ 11} As to the fourth condition, J.R. was diagnosed with major depressive disorder, anxiety disorder, attention deficit disorder, and a specific learning disorder. She is prescribed medications, but her use of them has been inconsistent—she had been off her medications for the two weeks prior to trial, but went back on them the day prior. J.R. attributed this to a loss of insurance paperwork. She was also referred to counseling on at least three occasions but did not successfully complete any of them. The trial court concluded that J.R. "has not successfully maintained consistent counseling and has not

demonstrated that she has remedied the mental-health concerns that led to or substantially contributed to the removal of [J.S.] from her custody." *Id.* at 10. The court also noted that despite being provided transportation assistance, J.R. has missed visitations for multiple-month periods during their separation. At the time of trial, she had not visited with J.S. for over one month, and previously had breaks in visitations for at least three months.

{¶ 12}  The FCCS caseworker testified that while J.S. was bonded to his mother and admitted that she had partially complied with the case plan, the agency maintained that it should be granted permanent custody of him. J.R.'s visitation with J.S. had been inconsistent, and FCCS expressed continued concerns about J.R.'s mental health (including anger, depression, and anxiety), her unstable relationships with multiple men (some of whom had crime and violence issues), her history of domestic violence, the lack of information about her current boyfriend, and the lack of evidence that she would be able to meet J.S.'s extensive medical and psychological needs. The guardian ad litem testified that she observed a bond between J.S. and J.R., but also recommended that the permanent custody be granted based on the same concerns.

{¶ 13}  J.S. informed the guardian that he wanted to see his mother, but the guardian stated that he never expressed any desire to live with her. The court found that J.S. told the guardian that "it would be ok if he did not see [J.R.]," that "he wants a family [and] he does not feel like he has a family." The court concluded that J.S. "wants to be adopted and be a part of a family." *Id.* at 12.

{¶ 14}  Upon analysis, the trial court concluded that clear and convincing evidence established that: (1) J.S. could not be placed with a parent within a reasonable time, and should not be placed with a parent; (2) J.S. had been in the agency's custody for two years or longer and no longer qualifies for temporary custody; (3) J.S. does not meet the

requirements for a planned permanent living arrangement; and (4) no relative or other person has come forward to seek legal custody. *Id.* at 11. As a result, the court concluded that "[t]here is no practical alternative to a permanent placement of [J.S.] with [FCCS] for the purpose of adoption." *Id.* at 12. Following an analysis of J.S.'s best interest using the R.C. 2151.414(D)(2) factors, *id.* at 11-13, the court concluded that "all four of the circumstances set forth [in the statute] were proven by clear and convincing evidence," and committed J.S. to the permanent custody of FCCS.

{¶ 15} This timely appeal followed. J.R. asserts two assignments of error with the trial court's judgment, both of which address the trial court's evaluation of the evidence. In her first assignment of error, J.R. asserts that the "trial court's permanent commitment of J.S. to FCCS was not supported by clear and convincing evidence and was against the manifest weight of the evidence that the commitment in was in J.S.'s best interest." In her second assignment of error, she claims that "[s]ufficient evidence was not presented to support the trial court's finding that the permanent commitment of J.S. to FCCS was in J.S.'s best interest." As they involve closely related questions, we will address the two assigned errors together.

{¶ 16} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence. Accordingly, an appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence. Further, in reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of fact. If the evidence is susceptible of more than

one construction, the court of appeals must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. *See generally In re J.W.*, 10th Dist. No. 19AP-122, 2019-Ohio-4775, ¶ 21 (citations and quotations omitted).

{¶ 17} Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. But parental rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. Accordingly, the state may terminate the parental rights of natural parents, but such termination must be in the best interest of the child. *See generally id.* at ¶ 22 (citations and quotations omitted). R.C. 2151.413 authorizes a public children services agency to file a motion requesting permanent custody of a child for which it has temporary custody, and when the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, the agency is required to file a permanent custody motion. R.C. 2151.413(D)(1), cited in *In re J.W.* at ¶ 23. R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14. "Clear and convincing evidence" is "more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *J.W.* at ¶ 14, and *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Rather, it means evidence that produces a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross*, paragraph three of the syllabus.

No. 20AP-68

{¶ 18} Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply," and second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.* at ¶ 18-20. Relevant to this appeal, R.C. 2151.414(B)(1) provides the following circumstances under which FCCS is authorized to file a motion for permanent custody:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> * * *.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

Once it is established that one of the R.C. 2151.414(B)(1) circumstances is met, a trial court ruling on a motion for permanent custody must determine whether permanent custody is in the best interest of the child. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that the court must consider in determining what is in the best interests of the child, and all of these factors are of equal importance under the statute. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

No. 20AP-68

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). Weighing these factors, the trial court must determine that an award of permanent custody is in the child's best interest by clear and convincing evidence.

{¶ 19} It is clear that the "first half" of the permanent custody test is easily met in this case. It was uncontested that in accordance with R.C. 2151.414(B)(1)(d), J.S. was in the custody of FCCS for a period of over 12 months prior to the filing of the permanent custody motion. And as the trial court observed, FCCS "need not provide any additional evidence as to the First-Part [sic] of the permanent custody test." (Jgmt. at 11.) But there was even more as to that first half, as the trial court also found that the child could not be placed with either parent within a reasonable time, and should not be placed with either parent based on failure to remedy the conditions that caused the original removal despite reasonable case planning and diligent efforts by FCCS. *See* R.C. 2151.414(B)(1)(a) and 2151.414(E)(1). The court also found that the parents—presumably only referring to J.S.'s father—had abandoned J.S. R.C. 2151.414(B)(1)(b). But even without those additional findings, as a

No. 20AP-68

result of R.C. 2151.414(B)(1)(d), the only question left for the trial court to decide was the "second half" of the permanent custody test—whether the termination of parental rights and grant of permanent custody to FCCS was established by clear and convincing evidence to be in J.S.'s best interest, using the five factors set forth in R.C. 2151.414(D)(1).

{¶ 20} Both of J.R.'s assignments of error argue that the grant of permanent custody to FCCS was unsupported by clear and convincing evidence that permanent custody was in J.S.'s best interest. And while there are admittedly worse cases of parental neglect than the one presented here, we cannot conclude that the trial court's decision that the first four factors of the best interest test were met by clear and convincing evidence is incorrect. Relevant to R.C. 2151.414(D)(1)(a), the court found that although J.R. and J.S. were bonded and there was love between them, the relationship had been complicated by J.R.'s failure to attend visits, and the court observed that J.S. has a good relationship with his current foster parents and liked being in their home. Relevant to R.C. 2151.414(D)(1)(b), the court held that J.S. understood permanency and adoption, that despite J.S.'s bond with his mother J.S. stated that it would be okay if he did not see her, and J.S. wants to be adopted and be part of a family. Relevant to R.C. 2151.414(D)(2)(c), the court held that at the time of trial J.S. had been in FCCS custody for almost three years, but that his current foster home was not a potential adoptive home. Relevant to R.C. 2151.414(D)(2)(d), the court observed J.S.' multiple developmental and mental disorders, J.R.'s failure to understand and participate in J.S.' counseling and treatment, J.R.'s own mental health issues, and the caseworker and GALS's beliefs that ultimately J.R. lacks the ability to care for J.S., and concluded that J.S. was in need of a legally secure placement.

{¶ 21} Based on all these findings, the court concluded that permanent custody was in J.S.'s best interest. In attacking the court's conclusion, J.R. implies, without

demonstrating, that J.S.'s behavioral issues were the result of him being in FCCS custody. But there is no evidence to support that implication, and we observe that the trial court's conclusions rest largely on actual current conditions—both J.S.'s and J.R.'s. Although she made some progress while J.S. has been in custody, J.R. has demonstrated continued instability and continued inability to address J.S.'s issues as well as her own. Upon review of the record and the arguments of the parties, we conclude that granting the permanent custody motion was in J.S.'s best interest was the correct decision, and that the decision was supported by clear and convincing evidence.

{¶ 22} For all these reasons, we conclude that appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody to FCCS should be affirmed.

*Judgment affirmed.*

KLATT and MENTEL, JJ., concur.