[Cite as *In re M.P.*, 2023-Ohio-1732.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re M.P., S.P.                                  Court of Appeals No.  L-23-1012

                                                 Trial Court No.  JC 20282152

                                                 <u>**DECISION AND JUDGMENT**</u>

                                                 Decided:  May 23, 2023

*  *  *  *  *

Anthony R. McGeorge, for appellee.

Autumn D. Adams, for appellant.

*  *  *  *  *

**MAYLE, J.**

## I.     Introduction

{¶ 1} In this appeal, I.P., the mother and appellant herein, appeals a final judgment of the Lucas County Court of Common Pleas, Juvenile Division that terminated her parental rights and granted permanent custody of her children, M.P. and S.P., to Lucas County Children Services ("LCCS"), the appellee herein.  For the following reasons, we affirm.

## II.     Background

### A. The Family's Involvement with LCCS

{¶ 2} M.P. and S.P. are fraternal twins, who were born on August 18, 2020.  One month after their birth, LCCS received a referral concerning allegations that father was heard "screaming at mother and the babies" and had stopped taking his medication for bipolar disorder and borderline personality disorder.  The Toledo Police were called to do a "well check."  According to LCCS, however, "[the] referral did not meet the criteria for an investigation" by the agency.

{¶ 3} On October 22, 2020, LCCS received a second referral alleging that S.P. "was observed to have bruising on her lower back, upper posterior thighs and buttocks."  Initially, the parents blamed the child's bruises on her crib.  When challenged about whether a crib could cause that type of bruising, the parents accused two different relatives.  They also "asked numerous questions about child development."  Ultimately, father admitted to becoming "panicky when the child cries a lot and [that] he hits the child on the back."  Father was also observed "not being very gentle with the child."

### B.  LCCS files a complaint, and a case plan is developed.

{¶ 4} LCCS filed a complaint on November 23, 2020.  By motion, the agency also requested emergency temporary custody of the children, which was granted.  The children were placed with their paternal aunt and uncle.

2.

{¶ 5} An adjudicatory hearing was held on January 14, 2021. The purpose of an adjudicatory hearing is "to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court." Juv.R. 2(B). At the hearing, the parents consented to a finding of dependency with regard to M.P., and a finding of abuse with regard to S.P.

{¶ 6} Mother's case plan required her to complete a psychological evaluation, obtain suitable housing and attend the following classes: parenting, "nonoffending parenting," and survivors of domestic violence. Following her evaluation, mother was diagnosed with depression and attachment disorder, and mental health services were recommended. Mother was granted Level 1 visitation with the children, which is the most restrictive and requires visits to be monitored by security at the agency.

{¶ 7} Pursuant to the case plan, the children were referred for a developmental assessment at Help Me Grow, which recommended occupational and speech therapy.

{¶ 8} Initially, father was included in the case plan and asked to complete a psychological evaluation, a dual diagnostic assessment, batterer's intervention and anger management services. Father did not complete any of those services. He was removed from the case plan sometime in 2021 after he "stopped meeting with [the case manager]." Between July of 2021 and August of 2022, there was no contact between father and LCCS. Father also failed to visit his children over a similar 13-month period. Although

3.

father emailed LCCS requesting to "reengage," in August of 2022, he had no "meaningful contact" with the agency after that time.

### C. LCCS moves for permanent custody, and a trial is held.

{¶ 9} On August 29, 2022, LCCS filed a motion for permanent custody of M.P. and S.P. With regard to mother's case plan, LCCS claimed that mother had completed some, but not all of her case planning services, had insufficient contact with her therapist and continued to maintain a relationship with father, who had abused her and S.P., and failed to progress beyond the most restrictive type of visitation.

{¶ 10} A trial was held on December 6, 2022. In all, 4 witnesses testified: LCCS caseworker, Delisha Osley; the guardian ad litem, Heather Pentycofe; mother; and Terri Timmons, a caseworker from Harbor Behavioral Healthcare. A summary of the relevant testimony follows:

### The LCCS Caseworker

{¶ 11} Delisha Osley served as the ongoing caseworker for the duration of this case and testified mainly about mother's participation in case-planning services.

{¶ 12} Over the two-year life of this case, mother was "inconsistent" and ultimately deemed "noncompliant" in obtaining mental health services. And, because of mother's "lack of progress" in that area, she was never referred to either parenting class. Under cross-examination, Osley agreed that mother claimed to have taken a parenting class on her own but never provided a certificate of completion.

4.

{¶ 13} Mother's case plan required her to identify someone who could "support" her in her parenting (excluding father), and Osley frequently inquired about who could serve in that role. Although mother mentioned her own mother ["grandmother"] as someone who could assist her, she never provided the agency with any contact information. Consequently, grandmother could never be linked to the case plan. Mother also failed to identify any potential placements for the children.

{¶ 14} In November of 2021, Mother successfully completed her domestic violence class. Osley expressed concern that, despite completing the class, mother had failed to "absorb" what was taught there, given that mother stayed in her relationship with father for over a year, until November of 2022, which was also four months *after* acknowledging to Osley that father had caused their daughter's injuries.

{¶ 15} Osley and her supervisor met with mother and told her that, although they could not "tell [her] who to be with," they were concerned that mother would stay with someone who was known to be abusive. Mother was "not * * * honest with the Agency about remaining in [her] relationship [with father]." Osley knew mother was lying after seeing some social media posts that showed mother and father "hugging and kissing" and looking "happy in * * * videos." Osley testified that it was "difficult to assist [mother] when she was not being honest about being in a relationship with [father]. Even when she was confronted, she was still denying, denying, denying that she was in a relationship with [him]." Osley added, "[i]t's difficult to help someone [like that]."

5.

**{¶ 16}** Housing was also an issue. There is no dispute that mother lived in a home, for some amount of time in 2021, that can only be described as grotesque. The record suggests that the children also lived there, before their removal. Pictures of the home, taken in November of 2021 by the Humane Society, were admitted at trial. The photos show "a pile of 20 dead cats," two cats "close to starvation," and trash, everywhere, including in the "twins' bedroom." When Osley asked about the cats, mother said that her "friend" was supposed to clean them up because mother "had to go to work."

**{¶ 17}** The record is less-than-clear as to where mother lived after November of 2021, but by June of 2022, mother told LCCS that she was living with her cousin. Mother would not allow Osley to "come out" and inspect the home for Osley to assess its suitability.

**{¶ 18}** Throughout the life of the case, mother made "multiple" allegations that aunt and uncle were sexually abusing the children. Osley testified that this was "an ongoing issue," and the allegations "just [became] more disgusting" over time. Each time, Osley recommended that aunt and uncle take the children to be examined. Osley estimated that the children were forced to undergo "over 20" physical exams as a result and that there was never any evidence to substantiate any of mother's claims.

**{¶ 19}** Based upon "mother's mental health, her not making any significant progress in any case plan services, * * * her allegations [against] the caregivers * * * and

6.

her ongoing relationship with her paramour, [i.e. father]," Osley concluded that terminating mother's parental rights would be in the children's best interests.

{¶ 20} Osley also testified that the children, who have lived with aunt and uncle since they were three months old, are "very happy" and "bubbly" and "adventurous" children who "love learning new things." Their placement with aunt and uncle has "most definitely" been beneficial for them. Osley testified that the children have made "significant progress" at Help Me Grow.

### Mother

{¶ 21} According to mother, when she first moved into the cat-infested home, it "was a nice home," but she agreed that it was possible that the dead cats had lain there for months before she moved out. Mother claimed that she attempted to "clean up" the dead cats, but father "put his hands on [her] and told [her] not to."

{¶ 22} At the time of the hearing, mother claimed to be living with her cousin, although later in the hearing, she said she was "staying at [her] mom's" because her cousin was having his home "remodeled." Mother admitted that she refused Osley to access her cousin's home, once she learned that LCCS had moved for permanent custody. In mother's words, "there was no point because what's the point of coming out * * * if permanent custody is just going to go to [aunt and uncle] anyway."

{¶ 23} Mother described aunt and uncle, whom she has known for years, as "nice, calming people." Mother testified that she "made the accusations" against them as a way

7.

of "lash[ing] out" after her children were "ripped away from" her because she was afraid that she would "never" get her kids back.

{¶ 24} Mother agreed that she could have contacted Osley for assistance on a variety of matters but did not because their communication was not "the best" and the two would often "butt heads."

{¶ 25} Mother testified that she was actively engaged in obtaining mental health treatment. Mother sees a "psych doctor" and a counselor on a regular basis. And, as a result of completing her one-hour domestic violence course, mother now knows what abuse looks like. After identifying many examples of abusive behavior, including physical and sexual abuse, mother testified that "[e]verything that [father] has done to me was all abuse." Despite her education, mother stayed with father for an entire year after completing the course. Mother explained that it "can take up to seven times [before] a woman * * * can leave a domestic violence relationship." Mother also said that she stayed with father as long as she did because he threatened to "slit everyone's throat in [mother's] family" if she left him. Mother expressed "regret" for not leaving him sooner.

{¶ 26} Mother testified that it would not be in the children's best interest if her parental rights were terminated and that she deserved a "second chance" for making "so much" progress with regard to her mental health, housing and parenting.

8.

## Mother's witness

{¶ 27} Mother called her case manager from Harbor, Terri Timmons, to testify on her behalf. Timmons confirmed that mother has been receiving treatment at Harbor for over three years, since before the children were born and the agency's involvement in this case. Timmons "linked" mother with various community resources, including a food pantry and "clothing." Timmons described mother as "warm and caring" and "really sweet and nice."

{¶ 28} According to Timmons, mother recently began receiving "day treatment" and attended "pretty consistent[ly]." Mother was also one of the first to sign up for a peer support group, which was "brand new" to Harbor. Because Timmons is not licensed, she could not render an opinion as to mother's progress but could only testify that mother had "been attending those groups regularly [and] has been participating." According to Timmons, mother has expressed being "frustrat[ed]" and "upset[]" over being separated from her children.

## The Guardian Ad Litem

{¶ 29} Lastly, the guardian ad litem, Heather Pentycofe, testified. Pentycofe has served as the GAL for the entirety of the case, and her report was admitted as an exhibit at trial.

{¶ 30} According to the GAL, aunt and uncle were no longer willing to serve as legal custodians to the children, in light of mother's repeated "unfounded allegations" of

9.

abuse against them.  In addition to making claims of sex abuse, mother also claimed that the children's "caregiver * * * put the bruises on [S.P.] and not [father]."  As result of mother's claims, aunt was investigated by her employer.  At trial, the GAL testified that she was unmoved by mother's recent apology because mother continues to make "more allegations," specifically that the children are "not being tested" or "cared for" regarding a genetic hemoglobin issue.

{¶ 31} The GAL visited aunt and uncle's home "several times."  She described it as "very clean [and] appropriate, especially given two toddlers running around."  The GAL also verified that the children were progressing in their case plan services at Help Me Grow.  The GAL would support foster parents' petition to adopt, if such a motion were filed.

**D.  The court grants LCCS's motion for permanent custody.**

{¶ 32} On December 15, 2022, the juvenile court granted LCCS's motion, terminating mother and father's parental rights and awarding permanent custody of M.P. and S.P. to LCCS.  Mother appealed and raises a single assignment of error for our review[1]:

> I.  It was against the manifest weight of the evidence for the Trial Court to grant LCCS' motion for permanent custody.

---

[1] Because father did not attend the hearing or file an appeal, we confine our discussion to the issues raised by mother in her appeal.

10.

### III. Law and Analysis

#### A. The statutory framework

{¶ 33} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18, citing *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.* All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.,* 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 34} In this case, the juvenile court found—as to the first requirement—that R.C. 2151.414(B)(1)(a) and (d) applied, i.e. that the children cannot and should not be placed with either of the parents within a reasonable time *and* that the children have been in the temporary custody of LCCS for 12 or more months of a consecutive 22 month period. Specifically, the court found that the children had been in LCCS's temporary custody for "a consecutive 19 months of a consecutive [22]-month period," i.e. from

11.

January 14, 2021 until August 29, 2022, when LCCS filed its motion for permanent custody. (Dec. 15, 2022 J.E. at 7). The court further found that, because Section (B)(1)(d) applied, "analysis pursuant to [Section] (B)(1)(a) is not necessary." But, it was "important" to the court to say that, even if the children had not been in LCCS's custody for 12 or more months, it "still would have found" that the children cannot, or should not, be returned to either parent, under R.C. 2151.414(B)(1)(a). In reaching that conclusion, the court considered and found that R.C. 2151.414(E)(1) and (4) applied, as to mother.

{¶ 35} On appeal, mother concedes that "the first prong of the permanent custody test has been met." (Appellant's brief at 4). Mother's only challenge on appeal is the juvenile court's finding as to the second prong, i.e. that a grant of permanent custody to LCCS was in the children's best interest. Accordingly, we confine our decision to that issue. *Accord In re A.M.* at ¶ 18.

{¶ 36} An agency that seeks permanent custody of a child bears the burden of proving that the grant of permanent custody is in the child's best interest. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. The relevant statute, R.C. 2151.414(D)(1), provides:

> In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

12.

(a) The interaction and interrelationship of the child with the child's

parents, siblings, relatives, foster caregivers and out-of-home providers, and

any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or

through the child's guardian ad litem, with due regard for the maturity of

the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and

whether that type of placement can be achieved without a grant of

permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this

section apply in relation to the parents and child.

**{¶ 37}** R.C. 2151.414(D)(1) does not require a juvenile court "to expressly discuss

each of the best-interest factors." *In re A.M.* at ¶ 31. "Consideration is all the statute

requires, [but] a reviewing court must be able to discern from the magistrate's or juvenile

court's decision and the court's judgment entry that the court satisfied the statutory

requirement that it consider the enumerated factors." *Id.* at ¶ 31.

**{¶ 38}** We review a trial court's determination in a permanent custody case under

a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060,

2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable

13.

inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotation marks and citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

## B. The manifest weight of the evidence supports the trial court's finding that an award of permanent custody to LCCS is in the children's best interest.

{¶ 39} In her sole assignment of error, mother argues that the juvenile court's best interest determination was against the manifest weight of the evidence. We address each of the juvenile court's findings below.

### 1. Children's Interactions and Interrelationships

{¶ 40} With respect to the best interest factor set forth in R.C. 2151.414(D)(1)(a), regarding the children's relationship with others, the court found,

> Mother has consistently visited with the children, but she has made
>
> numerous unfounded allegations against the caregivers. These allegations

have harmed the children to the extent that they have undergone invasive medical examinations to determine if these allegations are correct. Mother acknowledged that these medical examinations are invasive for the children, and she was aware when she alleged that the children were sexually or physically abused that medical examinations would be invasive. The paternal aunt and uncle have been the caregivers of these children throughout the li[fe] of this case and by all accounts the children have thrived in their care. Both children have been meeting their developmental milestones and the caregivers have been insuring that the children attended their appointments when they required special care. (Judgment Entry at 11).

{¶ 41} On appeal, mother argues that the trial court failed to adequately account for the "the bond the children have with Mother."

{¶ 42} Upon review, it is more than clear that mother "loves [her] kids with everything [she] has," but the record is silent with respect to whether the children were "bonded" with her. Perhaps this is because the children were removed at such a young age (aged three-months) or because mother's visits were limited to just one hour per week. And, although the GAL testified that the visit she observed between mother and the children was "appropriate," in that the "kids didn't seem fearful or apprehensive," she did *not* testify that mother and children exhibited any signs of being "bonded."

15.

Conversely, the GAL testified that the children have received excellent care from aunt and uncle and are "absolutely" bonded with them. Likewise, the caseworker characterized the home environment at aunt and uncle's as "very loving," where the children's "basic needs are being met," and that the children are "bonded" with them.

{¶ 43} The record also supports the trial court's finding that mother's "unfounded" allegations of abuse "harmed" the children. Indeed, mother's accusations set off a chain reaction that resulted in the children having to undergo "over 20" medical examinations, ultimately requiring aunt having to be investigated by her employer. We also reject mother's argument that LCCS was "under no obligation" to have the children examined following her claims of abuse.

{¶ 44} Ironically, mother *continues* to maintain that there is a "legitimate concern regarding the children's medical care that was going ignored." Curiously, mother does not identify that concern by name or point to any evidence that "it" was being ignored. But, the GAL testified at trial that mother continues to make "more allegations," specifically that the children are "not being tested" or "cared for" regarding a genetic hemoglobin issue. According to the GAL, it's not a "new thing" and "it's been addressed and its been addressed to [mother] that [the children have] been medically evaluated." The GAL added that "it's not something that we're going to keep going down with these children."

16.

{¶ 45} Upon review, we find that the evidence clearly supports the trial court's conclusion that mother's actions jeopardized the well-being of the children in this case. We further find that the evidence supports the court's conclusion that the children are well-adjusted in their foster home placement and bonded to aunt and uncle. Accordingly, we conclude that the weight of the evidence supports the juvenile court's findings and that the court properly considered R.C. 2151.414(D)(1)(a).

### 2. The Children's Wishes

{¶ 46} With respect to R.C. 2151.414(D)(1)(b), the trial court found that the children "are two years old, and they are unable to express their wishes. However, the GAL testified that she believed that a grant of permanent custody to LCCS [was in the best interests of the children] so they could be placed for adoption by the paternal aunt and uncle." *See also* Dec. 6, 2022 Tr. at 98.

{¶ 47} At hearing, the GAL testified that a grant of permanent custody in LCCS's favor would be in the children's best interest. She explained that, in the two years since the case was opened, mother made little progress. The GAL cited the fact that mother is still limited to the most restrictive visits and failed to "utilize[] services" to end her relationship with father and instead "consistently" remained with him, despite the fact that he abused her and their daughter. The GAL testified that it was her "duty" as guardian ad litem to protect M.P. and S.P., who—at two years-old—are "too young to

17.

verbalize harm." She expressed concern that, if the children were returned to mother's care, that they "would be back in harm's way."

{¶ 48} The trial court's reliance upon the GAL's testimony and written report when considering the best interests of the children was appropriate under section (D)(1)(b), and mother does not specifically challenge that evidence. We find that the juvenile court's finding under R.C. 2151.414(D)(1)(b) was not against the manifest weight of the evidence.

### 3. Custodial History

{¶ 49} With respect to Section (D)(1)(c), regarding the "custodial history" of the children, the court found that "the children have been in the care of their paternal aunt and uncle for the vast majority of their short life. When they were in the care of their parents for approximately three months [S.P.] was abused by her Father. Neither parent progressed in their case plan services."

{¶ 50} At hearing, the GAL testified that, since their removal at age three-months, the children "[have] been placed with [aunt and uncle]." She described "the only home they've really known" as a "very clean * * * especially given two toddlers running around." She said that each child has his or her own space, room, and bed.

{¶ 51} In sum, the facts support the trial court's finding—that R.C. 2151.414(D)(1)(c) weighed in favor of granting permanent custody to LCCS.

18.

## 4. Legally Secure Permanent Placement

{¶ 52} With respect to Section (D)(1)(d), regarding the children's "need for a legally secure placement," the court made the following findings:

> The children deserve a legally secure permanent placement. However, that permanent placement cannot be achieved without a grant of permanent custody to LCCS. Mother and Father have been presented with ample opportunities to remedy the issues that caused the removal of their children. As noted above, the parents have made little to no progress and reunification with their parents cannot occur within a reasonable time. Perhaps more concerning to this Court than the parents lack of progress in ameliorating the concerns that caused the children to be removed is Mother's unfounded allegations resulting in continued harm to the children by subjecting them to invasive medical examinations. These children cannot be compelled to wait forever to have permanency. These children deserve to be in a legally secure placement, and this cannot occur without a grant of permanent custody to LCCS.

{¶ 53} On appeal, mother argues that "the only reason" permanent custody was sought in this case was to make aunt and uncle's life "more convenient." Mother's claim flies in the face of her previous apology for maliciously accusing them of sexual abuse. And, while mother's false accusations were indeed a factor in LCCS's decision to seek

permanent custody, it had nothing to do with "convenience" but rather the well-being of the children and their caregivers. At hearing, the GAL expressed why aunt and uncle felt the current arrangement was no longer workable:

> I think one [reason] is fear [for] [t]hese children—[that] they're never going to be able outside of a supervised setting, with the allegations that have been repeatedly made and exposing them to multiple medical appointments as well as the allegations to [aunt and uncle] themselves. It opens them up to having to deal with that and not being comfortable to being supervised. So you're exposing these children to be supervised most of their lives [absent terminating the children's parental rights.]

{¶ 54} The caseworker echoed the sentiment that mother had "burn[ed] her bridges" and aunt and uncle "didn't want to deal with [mother] for the rest of the twins' lives."

{¶ 55} On a different subject, mother also argues that the court's consideration—that she moved four times in two years—is akin to a finding that "any parent that moves, such as a military family, does not provide stable housing for their children simply by moving." She claims to have been punished for being "too poor to afford [her] own housing."

{¶ 56} But, there is no indication that mother's housing issues were the result of a lack of means. First, mother testified that she was employed and "more than capable of

20.

keeping a place" for herself and her children. Ironically, mother testified that she provided food for the cats because she "was the only one working." In the court's view, mother's testimony as to why she cohabitated with decaying cats—because "she had to go to work" or because father "put his hands on her"—raised more questions than answers, and the juvenile court was clearly troubled by it, too. Furthermore, while mother may indeed have secured suitable housing by June of 2022, when she moved in with her cousin "Brandon,"—whose last name she could not pronounce—the fact is *she prohibited the agency from ever seeing the house*. Mother acknowledged that her decision not to allow the caseworker access to the home made reunification with the children impossible. In any event, it was these issues, and not mother's economic circumstances that caused the trial court to conclude that she failed to demonstrate that she could provide a safe and stable home.

{¶ 57} Although the Ohio Revised Code does not define the term, "legally secure permanent placement," courts have generally interpreted the phrase to mean "a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires an environment that will provide for child's needs). In sum, the record does not support

mother's claim that LCCS unfairly considered her lack of stable housing or her alleged poverty in its best interest finding.

{¶ 58} We find that the trial court's findings under R.C. 2151.414(D)(1)(d) weighed in favor of granting permanent custody to LCCS and were not against the manifest weight of the evidence.

### 5. R.C. 2151.414(D)(1)(e)

{¶ 59} The final factor with respect to a trial court's best interest evaluation concerns "[w]hether any of the factors in divisions (E)(7) through (11) of [R.C. 2151.414] apply in relation to the parents and child." Those factors involve, respectively, a parent's having been convicted of or having pled guilty to specific criminal offenses; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *See In re A.M.* at ¶ 19.

{¶ 60} With respect to this factor, the trial court found, "[a]s set forth above, R.C. 2151.414(E)(10) [abandonment] applies with respect to children's father." It did not find that any those factors applied as to mother. And, the record contains no evidence that any of those factors apply, and mother has not argued otherwise. *Id.* at ¶ 36, citing *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330 ("Because no evidence was presented to the trial court that any of the factors set forth in Sections 2151.414(E)(7) through (11)

22.

applied, * * * the trial court was not required to discuss or make findings under" R.C. 2151.414(D)(1)(e)).

{¶ 61} While mother does not refer to any of the factors referenced in Section (E)(7)-(11), she does assert—with regard to the trial court's best interest finding—that the court erred in finding that mother failed to "substantially remedy the conditions causing the children to be placed outside the home" and further erred in finding that mother "demonstrated a lack of commitment toward the children." Mother's arguments pertain to the court's findings under R.C. 2151.414(E)(1) and (4), respectively, which are *not* factors to be considered under a best interest analysis. Instead, they are factors to be considered in evaluating whether the children "cannot be placed with either parent within a reasonable time or should be placed with either parent" under R.C. 2151.414(B)(1)(a), i.e. the first element in a permanent custody analysis. Mother concedes that the "first prong of the permanent custody test [was] met in this case." Accordingly, her arguments—with regard to the trial court's findings under Section (E)(1) and (E)(4) are not relevant vis-a-vis its best interest finding.

{¶ 62} In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *In re C.M.,* 4th Dist. Athens Nos. 17CA16, 17CA17, 2017-Ohio-9037, ¶ 73, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). Having examined the

23.

record, we conclude that the court had sufficient evidence, and that its decision was not against the manifest weight of the evidence. Accordingly, we find that mother's assignment of error—that the trial court's best interest determination was against the manifest weight of the evidence—is not well-taken.

### IV. Conclusion

{¶ 63} For the reasons expressed above, we find that the juvenile court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find that mother's assignment of error is without merit. Therefore, the December 15, 2022 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to mother.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                            JUDGE
Christine E. Mayle, J.

                                              _____
Gene A. Zmuda, J.                                           JUDGE
CONCUR.

                                              _____
                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.