[Cite as *In re D.S.*, 2025-Ohio-441.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                          :

D.S.,                                      :          No. 23AP-317
                                                  (C.P.C. No. 18JU-13110)
[J.S., Father,                             :

                                                  (REGULAR CALENDAR)
            Appellant].            :

---

D E C I S I O N

Rendered on February 11, 2025

---

**On brief:** [*Mitchell A. Williams*], Public Defender, and *Robert D. Essex*, for appellant J.S.

**On brief:** *Robert J. McClaren*, and *Sharon K. Carney*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant, J.S., father of the minor child, D.S. (dob 04/23/2018), appeals the April 23, 2023 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, to grant the June 30, 2020 motion filed by appellee, Franklin County Children Services (the "Agency"), to terminate his parental rights to D.S., and award permanent custody of D.S. to the Agency.

{¶ 2} D.S. and his older half-brothers, D.R., Jr. and D.A., were placed in the temporary custody of the Agency based on findings of dependency on February 8, 2019. The trial court eventually sustained permanent custody motions as to all three children, but as neither the children's mother, M.S., nor the respective fathers of D.R., Jr. or D.A. have challenged the trial court's orders as to those children, this appeal relates solely to the rights of D.S.'s biological father, J.S.

{¶ 3}   The three children were originally removed from the care of their respective parents in August 2018, based primarily on concerns about the fitness of M.S.  At the time of removal, the whereabouts of J.S. were not known.  The Agency had earlier become aware that M.S.'s habitual substance abuse was impacting her ability to care for the children, and M.S. was also unable to establish stable housing, having lived in nine different temporary residences (including hotels, the homes of relatives and acquaintances, and a garage) in less than two years.  The Agency was originally involved on a voluntary basis but, despite numerous attempts, was unable to assist M.S. in stabilizing her life, and the fathers of D.S's older half-siblings were likewise unfit or uninvolved.  And for a substantial portion of the time that D.S. was in foster care, J.S. denied he was D.S.'s father.  Notwithstanding, during this period, he maintained a relationship with M.S. and attended visits with D.S.

{¶ 4}   On July 19, 2019, the Agency filed its first motion for permanent custody of D.S., asserting that pursuant to R.C. 2152.414(B)(1), D.S. had been in the custody of the Agency for 12 or more months out of a consecutive 22-month period, and that D.S. could not be placed with either of his parents within a reasonable time, or that D.S. should not be placed with either of his parents.  On January 29, 2020, the magistrate dismissed that motion on the request of the Agency and extended the Agency's temporary custody of D.S. for an additional six months.

{¶ 5}   At a semi-annual review on March 4, 2020, the Agency reported that J.S. had completed DNA testing that confirmed he was D.S.'s biological father.  It was also reported that J.S. worked part-time at Enterprise and that he maintained housing, although when the Agency caseworker attempted to visit said housing, J.S. denied her entry, claiming it was "a mess," and indicated that he would "have different housing when [D.S.] comes to live with him."  (Mar. 4, 2020 Semi-Annual Adm. Rev. at 4.)

{¶ 6}   On June 25, 2020, an amended case plan was filed, specifically including J.S. as a party.  It observed that J.S. "reported he does not have any caretaking roles for [D.S.] or [M.S.'s] other two children [and] has reported he's not in a relationship with [M.S.], however he does assist her financially sometimes."  (June 25, 2020 Am. Family Case Plan at 1-2.)  The plan ordered J.S. to keep appointments and provide information to complete a general assessment and an assessment to determine his ability to provide care for D.S., to maintain a legal source of income and hazard-free housing, to attend weekly visitation with

D.S. and develop a relationship with him, and to complete a drug urine screen and if there is a positive result, to complete an alcohol and drug assessment and follow through with the assessment's recommendations. *Id.* at 2.

{¶ 7} On June 30, 2020, the Agency filed a new motion for permanent custody, asserting that pursuant to R.C. 2152.414(B)(1)(a), D.S. had been in the custody of the Agency for 12 or more months out of a consecutive 22-month period, and that D.S. could not be placed with either of his parents within a reasonable time, or that D.S. should not be placed with either of his parents; and pursuant to R.C. 2152.414(B)(1)(d), D.S. has been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. The motion observed that J.S. "has had contact with the caseworker and visits the child regularly . . . [but] reported to Children Services that he received some charges outside of Franklin [C]ounty relating to illegal substances." (June 30, 2020 Franklin Cty. Children Servs.' Mot. for Permanent Custody at 5.) The motion further alleged that D.S.'s "parents have not made significant progress in reaching their case plan goals or alleviating or mitigating the problems that initially resulted in the child's removal." *Id.* at 6.

{¶ 8} The motion did not immediately proceed to trial—in fact, the trial did not commence until some 28 months later, on December 19, 2022. In the interim period, D.S.'s Guardian ad Litem ("GAL") visited J.S.'s home and reported the following concerns:

> [J.S.], father of [D.S.,] has spoken with the Guardian Ad Litem on many occasions. He expressed his concern for [D.S.] and appears to be willing to do what needs to be done to ensure his welfare but has come up short on case plan objectives. Recently, [J.S.] has rarely screened. [J.S.] has been visiting [D.S.] consistently. The Guardian Ad Litem has some concerns as to [J.S.'s] living situation. The Guardian Ad Litem visited the home of [J.S.] with the caseworker previously. The home was cluttered and not appropriate for a small child. During the visit, [J.S.] received multiple calls on his cell phone and several individuals knocked on the door. This week an attempt was made by the Guardian Ad Litem to visit with [J.S.] Despite an appointment being made, [J.S.] did not answer the door.

(July 20, 2022 Report of the Guardian ad Litem at 4.) On November 15, 2022, the GAL filed his final pre-trial report and observed that J.S. "does participate in the visits at the Agency with [D.S.] and often brings him gifts," and that J.S.'s interactions with D.S. were "appropriate." (Nov. 15, 2022 Report of the Guardian ad Litem at 4.) But he also observed that J.S. "has rarely screened and has not screened at all despite being ordered to do so,"

and further reiterated his earlier concerns about J.S.'s behavior and living situation. *Id*. at 5. The GAL recommended that the trial court grant the Agency's motion for permanent custody.

{¶ 9} At trial, J.S. stated that he "believe[d]" that D.S. was his son, but that "I haven't seen the [DNA test] percentage." (Dec. 19, 2022 Tr. at 68.) He testified that he had "22" children, including D.S., that his next youngest child was 15 years old and lived with his mother, "[a]llegedly in Arizona." *Id*. at 69. He further testified that his oldest biological child was 33, but that "my oldest child is 36 that I've been raising since he was six years old." *Id*. at 71. After clarification, he indicated that he had nine biological children." *Id*. at 72.

{¶ 10} J.S. testified that he had been living in the same apartment for approximately six years; that his goal was to "either go to Memphis or down to North or South Carolina"; that he had been looking for a bigger place for "a couple of years" so that he could accept custody of D.S.; that he was not employed at the time of trial but was in school for "audio, video, and podcasting and D.J. and radio broadcast [with] Ohio Media"; that he was last employed in July 2020; and that if he were to gain custody of D.S., that he would sleep "in the living room, and he would have my bedroom." *Id*. at 74-75, 77, 80. He affirmed that he had let the caseworker and GAL into his home about three times, that it was "possible" there was a woman asleep in his bedroom while they were visiting, that she "was probably a friend," and that he has "a heart for homeless people, hungry people." *Id*. at 81-82. He stated that he was "no longer on parole or and/or convictions[;] [t]hey've all been completed," admitted that his charges were drug-related, and admitted that he "refuse[d] to sign a release of information for the caseworker and the agency" to allow contact with his probation officer. *Id*. at 82-83.

{¶ 11} J.S. also admitted that he had not completed an assessment for the Agency in connection with the case, but argued that "nothing has ever been explained to me of what I needed to do and what part Children Service would do . . . [t]hey was (sic) just telling me oh you need to do an assessment," and that he was "never asked to do a[n] alcohol and drug" assessment. *Id*. at 84-85. He affirmed that he probably did nine drug screens for the Agency and stated that he had "taken over 36 drug tests" in other counties, but admitted that the Agency could not obtain those records because he did not complete a release and

that he "didn't see it as necessary." *Id.* at 86. He also admitted that the trial court had ordered him to complete a drug screen after an earlier court hearing, but that he left without completing the test because he did not want to pay for it.

{¶ 12} Finally, J.S. admitted that he had difficulty with insects and mice at his house because "it's the projects . . . but I stay on top of it. . . . I just threw seven traps away in the last four days." *Id.* at 93. He also admitted that he owed approximately $13,000 in child support arrears and that his rent was $699 per month paid by HUD.

{¶ 13} Following the trial, the trial court terminated the parental rights of both J.S. and M.S. and granted the Agency's motion for permanent custody. Regarding J.S., the trial court found as follows:

> [J.S.], [D.S.]'s alleged father has been peripherally involved since the inception of the case. [J.S.] has attended most court proceedings and has consistently visited with [D.S.] [J.S.]'s interactions with [D.S.] are appropriate.
>
> [J.S.] was an interictal (sic) part of [M.S.]'s life and it is believed they were a couple and resided together when the children were removed from home. [D.S.] was six (6) months old when he was removed from his parents' home, he is now four (4) years old and he has spent the majority of his life in foster care placement. [J.S.] has yet to file a motion for custody or for extended visits. He has been content to visit with [D.S.] for an hour each week at the agency. Between 2018 and 2019, [J.S.] and [M.S.] had joint visitation and he was her transportation.
>
> [J.S.] has had almost four (4) years to substantially complete his case plan. He was to:
>
> (1) Complete an AOD assessment.
>
> (2) Sign releases of information.
>
> (3) Complete random drug screens.
>
> (4) Visit with [D.S.] regularly.
>
> (5) Meet with the caseworker every thirty (30) days.
>
> The only portion of his case plan that [J.S.] substantially complied were with visitation and contact with the caseworker monthly.
>
> The caseworker testified [J.S.] refused to sign any releases of information. [J.S.] has completed some urine screens but did not successfully complete an AOD assessment.
>
> [J.S.] stated he is currently unemployed and is currently attending school to obtain credentials in order to obtain

> employment. [J.S.] admitted he has substantial child support arrearages. Furthermore, [J.S.] stated that he has maintained the same housing through this matter.
>
> Appropriate housing was of grave concern to the Guardian ad Litem and the caseworker. Both testified [J.S.]'s housing is not habitable for [D.S.] Testimony revealed [J.S.]'s residence had an infestation of mice, was badly cluttered and not in an appropriate state for a small child. The caseworker testified the house was cluttered to the extent there was no safe egress, walking space or operable bathtub. She testified almost every space was filled with something and was not safe. Caseworker stated [J.S.] has not corrected or remedied his living conditions. [J.S.] stated it will be remedied.

(Apr. 24, 2023 Decision & Jgmt. Entry at 20-21.) Based on the foregoing, the trial court concluded that D.S. "cannot be placed with any parent within a reasonable time and should not be placed with either of [his] parents, R.C. 2151.414(B)(1)(a)." *Id.* at 23. J.S. now appeals and asserts a single assignment of error with the trial court's judgment, contending that "[t]he trial court committed reversible error by terminating the appellant-father's parental rights when the decision was against the manifest weight of the evidence." (Brief of Appellant at vi.)

{¶ 14} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence. Accordingly, an appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence. Further, in reviewing a judgment granting permanent custody to the Agency under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of fact. If the evidence is susceptible of more than one construction, the court of appeals must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. *See generally In re J.W.*, 2019-Ohio-4775, ¶ 21 (10th Dist.).

{¶ 15} Moreover, parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. But parental rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. Accordingly, the state may terminate the parental rights of natural parents, but such

termination must be in the best interest of the child. R.C. 2151.413 authorizes a public children services agency to file a motion requesting permanent custody of a child for which it has temporary custody, and when the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, the agency is required to file a permanent custody motion. R.C. 2151.413(D)(1), cited in *In re J.W.* at ¶ 23. R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re K.M.*, 2015-Ohio-4682, ¶ 14. "Clear and convincing evidence" is "'more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt.'" *In re J.W.* at ¶ 24, quoting *In re K.L.*, 2013-Ohio-3499, ¶ 14 (10th Dist.). Rather, it means evidence that produces a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 2008-Ohio-4825, ¶ 42, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 16} Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.* at ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply," and second, the trial court determines whether granting permanent custody to the Agency is in the best interest of the child. *Id.* at ¶ 18-20. Relevant to this appeal, R.C. 2151.414(B)(1)(a) and (d) provide the following circumstances under which the Agency is authorized to file a motion for permanent custody:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> . . .
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing

agencies for twelve or more months of a consecutive twenty-two-month period. . . .

Once it is established that one of the R.C. 2151.414(B)(1) circumstances is met, a trial court ruling on a motion for permanent custody must determine whether permanent custody is in the best interest of the child. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that the trial court must consider in determining what is in the best interests of the child, and all of these factors are of equal importance under the statute. *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 17} Here, at the time of the second filing of the motion for permanent custody on June 30, 2020, D.S. had been in the continuous custody of the Agency for over 20 months and could not be placed with either of his parents within a reasonable time or should not be placed with his parents, and also at the time of trial, D.S. had been in the custody of the Agency for over 4 years. R.C. 2151.414(B)(1). The trial court concluded that pursuant to "R.C. § 2151.414(B)(1)(d), there is clear and convincing evidence that [D.S. has] been in the custody of Franklin County Children Services for more than twelve (12) out of twenty-two (22) consecutive months." (Apr. 24, 2023 Decision & Jgmt. Entry at 23.) We can find no fault with this conclusion.

{¶ 18} Accordingly, we move on to the second part of the permanent custody test, the best interest factors under R.C. 2151.414(D)(1). Pursuant to R.C. 2151.414(D)(1)(a), the trial court found:

> Testimony regarding the interaction between [D.S.] . . . and his alleged father, [J.S.], reveals that [J.S.] has consistently visited with [D.S.] since the inception of the case. [J.S.] is appropriate during visits. Testimony reveals that [D.S.] is very bonded to his father and wished to be reunited with him.
> . . .
> [But other t]estimony revealed that [D.S.] is very bonded with his foster family, which has been the only home [D.S.] knows. [D.S.] has been in the same foster home for over three (3) years of his short life. [The] Caseworker testified the foster home is the only home [D.S.] knows or interacts with.

(Apr. 24, 2023 Decision & Jgmt. Entry at 16.)

{¶ 19} Pursuant to R.C. 2151.414(D)(1)(b), the trial court found that "[D.S.] . . . is now four and a half (4 ½) years old. He is too young and immature to understand the concepts of adoption or permanency or to express his wishes. The Guardian ad Litem in his final report and in his testimony recommended that the Court grant the Motion for Permanent Custody." *Id.* at 17.

{¶ 20} The trial court did not state a specific finding under R.C. 2151.414(D)(1)(c), but the uncontroverted evidence established that D.S. had been in the custody of the Agency since he was six months old and for over four years, and that he was bonded to his foster family. And pursuant to R.C. 2151.414(D)(1)(d), in addition to finding that J.S. had failed to meet most of the goals of the case plan, the trial court found:

> [J.S.] has failed to substantially complete the most important goal for reunification, safe and stable housing. He has had almost four (4) years to improve his living conditions in order to provide a safe, secure and appropriate home. Income and socioeconomic level has nothing to do with hoarding, clutter beyond safety, and mice infestation which is more than likely to be contributed by the condition of the home. [J.S.] is not appropriate for placement. He cannot and should not be considered for placement of [D.M.]

*Id.* at 21-22. Based on all these findings, the trial court concluded that granting the Agency's motion and terminating J.S.'s parental rights to D.S. was in D.S.'s best interest. *Id.* at 23.

{¶ 21} On review of the entire record, we cannot say that the trial court's conclusions were not clearly and convincingly supported in the evidence. As the trial court correctly observed, the evidence established that J.S. loves D.S., wanted to provide for him, and wished to gain custody of him. But J.S.'s failure to comply with the case plan requirements and inability to ensure that D.S. would have safe and adequate housing if he were granted custody of D.S., demonstrates that the trial court correctly concluded that D.S. could not be placed with him within a reasonable time and should not be placed with him. And it unfortunately demonstrates that termination of J.S.'s parental rights and a grant of permanent custody to the Agency was in D.S.'s best interest. J.S.'s efforts to improve his living situation and provide a safe residence for D.S. were insufficient, despite his diligence in attending visits and keeping in contact with the caseworker.

{¶ 22} For all these reasons, we overrule J.S.'s sole assignment of error and affirm the judgment of the trial court granting the Agency's motion for permanent custody of D.S.

*Judgment affirmed.*

BOGGS and LELAND, JJ., concur.

————————————